800 A.2d 826

REGINA A. VISCIK, PLAINTIFF–RESPONDENT, v. FOWLER
EQUIPMENT COMPANY, INC., AND HELENE "LANIE"
FOWLER, DEFENDANTS–APPELLANTS.

Argued February 11, 2002—Decided March 28, 2002.

4

*John A. Ridley* argued the cause for appellants (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione*, attorneys; *Mr. Ridley* and *Karen L. O'Keeffe*, on the briefs).

*Christopher P. Kelly* argued the cause for respondent (*Reppert, Kelly*, attorneys).

The opinion of the Court was delivered by

LONG, J.

Four days after she was hired, plaintiff Regina Viscik (Viscik) was discharged from her position as a billing clerk with defendant Fowler Equipment Company, Inc. (Fowler). Thereafter, Viscik filed a complaint against Fowler alleging that her obesity was a handicap and that she had been discharged on the basis of that handicap in violation of the Law Against Discrimination (LAD). *N.J.S.A.* 10:5-1 to -42. She recovered a judgment that was affirmed by the Appellate Division. We granted Fowler's petition for certification and here revisit the standards applicable to a handicap case under LAD.

## I.

A trial was conducted at which the following facts were established. Regina Viscik has been overweight her entire life. At the age of seven, she weighed one hundred pounds, but doctors were confident that she would outgrow her heaviness. Viscik's weight, however, continued to increase; her teenage years were marked

by visits to specialists who prescribed diet pills and shots. At age eighteen, Viscik was hospitalized and placed on a diet. During her time in the hospital, doctors first diagnosed a metabolic disorder that prevents Viscik's body from breaking down fats and that results in her obesity. Due to that imbalance, everything Viscik eats becomes fat.

Two years later, Viscik was in a car accident where she suffered burns on her legs. Those burns would not heal due to her obesity. As a result, Viscik underwent weight-loss bypass surgery, during which all but twenty inches of her large intestine were disconnected. That section of intestine was then attached directly to her bowel, allowing food to pass through her body undigested. Although the surgery resulted in a dramatic loss of weight (Viscik lost 350 pounds in only one year), it also caused liver damage, kidney stones, gastritis and malnutrition. Due to the severity of those side effects, Viscik had the surgical procedure reversed and within a short time regained much of the weight she had lost.

As a result of her weight, Viscik has suffered from degenerative arthritis in her hip and knee joints, restricted lung capacity, and depression. She has also been diagnosed with bronchial asthma and asthmatic bronchitis, "underlying illnesses" that are further complicated by her weight. As a result, Viscik cannot take "enough oxygen into her system" or perform "any lifting or heavy work."

At the time she was hired by Fowler, Viscik stood five feet, nine inches tall and weighed approximately four hundred pounds. Her weight decreased to 326 pounds at the time of trial. She continues to take medication for asthma, arthritis and gastric problems. Occasionally, Viscik requires the use of a cane due to arthritis and knee problems resulting from her accident.

Despite those challenges, Viscik has been working since age eighteen. She is the primary breadwinner for her sister-in-law, her 20 year old niece, and her niece's two young children. Before applying for a position with Fowler, Viscik worked for three years as an accounts payable clerk for a manufacturing company.

Fowler is in the business of selling and servicing washer/dryer units for laundromats. In March of 1998, in an effort to render itself more efficient, the company hired Joyce Killmer (Killmer), a consultant, to analyze its operations and identify ways to improve them. One of Killmer's recommendations was to move the billing clerk out of the customer services' office. That space was too cramped and the billing clerk had difficulty concentrating because she was constantly answering the customer service phone. In May of that year, Fowler was in need of additional employees. Killmer drafted advertisements for three positions: customer services, accounts payable, and billing clerk.

In June of 1998, Viscik answered Fowler's ad along with fifteen other applicants. Although her cover letter did not specify which position she was seeking, her resume reflected her accounts payable background. Killmer was impressed with Viscik's resume, and invited her to interview with the company. Viscik informed Killmer at the interview that she was willing to accept and learn any of the available positions. Viscik was asked to return for a second interview with Fowler's general manager; he also was impressed with Viscik after speaking with her.

After the meeting with the general manager, Killmer brought Viscik's resume to the attention of Lainie Fowler (Mrs. Fowler), the owner's wife and the office administrator. Mrs. Fowler testified that Viscik's resume appeared acceptable and advised Killmer to hire her, as long as she was qualified. When Killmer informed Mrs. Fowler that Viscik was obese, Mrs. Fowler responded that she did not care what Viscik looked like, as long as she could do the job. Killmer testified that she could not recall that exchange, but acknowledged that Mrs. Fowler was ultimately responsible for hiring decisions.

Viscik accepted the job offer from Fowler, although initially it was unclear which position she would perform. At the time of her hiring, Viscik was told of Fowler's concern over improving efficiency. Viscik testified that she never mentioned any health problems at her interview.

During the week before she began work, Fowler decided to place Viscik in the billing clerk position. The existing billing clerk, Benny Valentin (Valentin), was to train her and then move to a new position in accounts payable. That arrangement would allow for cross-training and the continual performance of both jobs. The billing clerk position entailed organizing and reviewing the daily customer work orders submitted by the technicians, as well as generating customer invoices. An essential part of the job involved communicating with the service technicians to confirm their appointments and ensure the accuracy of their submitted orders. Communication was accomplished using a fax machine and Nextel two-way radio, both of which were located in the customer services' office. That office was some distance from the billing clerk's office even though 90% of the faxes received were for the billing clerk. Killmer estimated that any new hire would require approximately three to eight weeks to learn the job.

Viscik started work with Fowler on Monday, June 29, 1998. She was given a tour of the facilities and introduced to Valentin. Viscik shared her office with Karen Smith (Smith), the collections clerk. That office had only one phone that was to be used solely by Smith for business purposes. Although there was a lot to learn, Viscik testified that she had confidence in her ability to "pick up" the job.

On her second day of work, Viscik first made Killmer aware of her bad knee and arthritis, which, coupled with her weight, prevented her from moving around as quickly as others. She also mentioned that she occasionally required the use of a cane. Viscik testified that Killmer responded: "I don't care if you come in here on a skateboard. As long as you're here and you're doing the job, it doesn't matter." Viscik also testified that she had no problem moving around the office, aside from being a little slow.

On that same day, the first complaints about Viscik's work ethic were made. Smith testified that she observed Viscik using the phone in their office and in the conference room for personal calls. Smith felt compelled to tell Viscik that the office phone needed to

be kept clear for business-related calls. Valentin corroborated Smith's testimony, saying that she, too, saw Viscik making personal calls "often." Both women testified that they shared their concerns with Killmer. Killmer could not recall either conversation. Mrs. Fowler, however, did recall Killmer sharing Smith's and Valentin's concerns with her. Mrs. Fowler was so troubled by those reports that she set some time aside the next day to observe Viscik for herself. During that time, Mrs. Fowler observed Viscik being unproductive and making a personal phone call.

Killmer had a different recollection of the "complaints" about Viscik and her conversation with Mrs. Fowler. She reported that Valentin spoke with her about Viscik but recalled that Valentin told her that she did not think Viscik was able to stand by the copier. Killmer testified that she mentioned both Valentin's observation and Viscik's statements about her mobility to Mrs. Fowler. Killmer stated that Mrs. Fowler became concerned and instructed her to watch Viscik closely.

On Viscik's third day of work, Killmer herself observed Viscik having difficulty standing as she waited for a dispatcher to train her to retrieve faxes. Killmer claims that when she brought that to Mrs. Fowler's attention, Mrs. Fowler instructed her to fire Viscik. Killmer testified that Mrs. Fowler made no mention of Viscik's work ethic or personal calls.

Mrs. Fowler testified that she viewed Viscik's lack of productivity and poor work ethic as fatal. She asserted that she did not warn Viscik that her behavior was unacceptable because in her mind, a poor work ethic so early in her employment was "a big problem." Mrs. Fowler stated that she did not want to warn Viscik and go through the trouble of training her only to have the problem recur, as she was certain it would. As a result, Mrs. Fowler instructed Killmer to fire Viscik.

On her fourth day of work, Viscik was discharged. Killmer delivered the news, telling Viscik that she was sorry, that it was not her decision, but that the company wanted someone who could move around the office better than she could. Viscik immediately

began an extensive job search; twenty interviews and seven weeks later, she secured another position. She then instituted this lawsuit.

At trial, Dr. Shen, Viscik's treating physician since 1991, testified about Viscik's illnesses, including her obesity and its complications, as a medical expert qualified in internal medicine and weight-loss. Dr. Shen stated that Viscik's obesity was "genetic" and that her weight consistently ranged from approximately 340 to 450 pounds even though the ideal weight for her height and age was 180 to 185 pounds. He also stated that Viscik had several obesity-related illnesses, including degenerative arthritis in her lower back, hip and knee, which were "accelerated" by her weight. Furthermore, Dr. Shen noted that Viscik's obesity aggravated the "underlying illnesses" of chronic obstructive lung disease and bronchial asthma.

In light of Viscik's myriad conditions, Dr. Shen diagnosed Viscik with "morbid obesity." [1] Dr. Shen explained that the term referred to "the disease" that occurs when a person has "a medical illness as a result of ... obesity." In Viscik's case, Dr. Shen found that her arthritis, restrictive lung disease, and depression stemmed directly from her obesity. Despite attempts to treat Viscik's obesity through "diet restriction and diet control," Dr. Shen found that her obesity constituted a "handicap" for Viscik because she could not "perform ... the tasks that normal people could."

The jury returned a verdict in Viscik's favor, awarding her $50,000 in damages. Viscik was also awarded counsel fees. New trial motions filed by both parties were denied. Both parties appealed, raising numerous issues, all of which were addressed by the Appellate Division in a decision affirming the judgment in all respects. Only three of those issues, all raised by Fowler, are

---

[1] The term "morbid" means "diseased or pathologic." *Stedman's Medical Dictionary*, 4th *L.Ed.* unabridged, 885 (1976). "Morbid obesity" means "obesity sufficient to prevent normal activity." *Id.* at 970.

relevant here: that Viscik failed to prove that she was handicapped and that the trial court erred in two aspects of the jury charge.

With respect to Fowler's claim that Viscik's condition did not meet the definition of a handicap under LAD, the Appellate Division noted that her 400 pound weight, her inability to control it, and the medical complications arising from her obesity clearly qualified her obesity as a "physical disability" resulting from a "physiological condition" which was "demonstrable ... by accepted clinical laboratory diagnostic techniques." The court also held that because Viscik was obese from the time she was a young child, "a reasonable jury clearly could have concluded that her obesity is a 'developmental disability'" or a "genetic birth defect." It also characterized the knee injury resulting from the accident as a "physical disability or infirmity" caused by "bodily injury." Finally the court held that Viscik's condition met the definition of "physical reliance" on a "remedial appliance or device" because she used a cane. Accordingly it concluded that the evidence supported the jury verdict that Viscik was handicapped. The panel then considered Fowler's objections to the jury charge, beginning with the argument that the trial court "misled the jury by instructing it that the employer's justification for termination ... must be that of a reasonable or theoretical employer." The court acknowledged that the trial court erred in invoking that standard but concluded that, in viewing the charge as a whole, the error was "sufficiently fleeting" and did not mislead the jury.

Finally, the court addressed Fowler's objection to the inclusion of a reasonable accommodation instruction and definition in the charge. The court held that the facts supporting a reasonable accommodation claim had been adduced at trial:

If the jury credited Killmer's account that lack of mobility was the reason for plaintiff's termination, then defendants had an obligation to accommodate plaintiff's limitations under N.J.A.C. 13:13–2.5. As plaintiff's attorney stated, without an instruction on the employer's duty to provide reasonable accommodation the jury might have determined that plaintiff's handicap precluded her from performing her job.

We granted Fowler's petition for certification, limited to the three issues outlined above. *Viscik v. Fowler Equipment Co., Inc.,* 170 *N.J.* 386, 788 *A.*2d 771 (2001).

## II.

On appeal, Fowler argues that the Appellate Division erred in concluding that Viscik established a handicap within the meaning of LAD; that Viscik met neither of the two standards in the statute for establishing a handicap; that the Appellate Division improperly "mixed and matched" the elements of two different handicap standards; and that the facts do not support the Appellate Division's conclusion. Fowler also claims that the trial court erred in instructing the jury regarding "reasonable accommodation;" that that concept was never pled; that Viscik never sought an accommodation; that an accommodation charge is not warranted where all parties agree that a plaintiff is capable of performing the job; and that the pervasiveness of the reasonable accommodation concept in the charge poisoned it. Lastly, Fowler contends that the trial court erred in instructing the jury that the standard to be applied in assessing an employer's justification for termination is that of a reasonable, objective employer.

Viscik counters that the proofs adduced at trial clearly support the conclusion that she is handicapped under LAD; that a reasonable accommodation instruction was necessary for completeness and that the objective employer standard constituted harmless error.

## III.

The New Jersey LAD was enacted in 1945 with the express purpose of ensuring that the civil rights guaranteed by the State Constitution are extended to all its citizens. *L.* 1945, *c.* 169; *N.J.S.A.* 10:5-2. That goal has particular resonance in the area of employment discrimination, where LAD declares that the opportunity to gain employment without fear of discrimination is a civil right and that discriminatory action "menaces the foundation of a

free democratic state." *Andersen v. Exxon Co., U.S.A.*, 89 *N.J.* 483, 491, 446 *A.*2d 486 (1982) (citing *N.J.S.A.* 10:5-3 & N.J.S.A. 10:5-4).

In furtherance of its goals, LAD has evolved to encompass various forms of discrimination. *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 68, 389 *A.*2d 465 (1978). The statute was amended in 1972 to prohibit employment discrimination against the physically handicapped (*L.* 1972, *c.* 114.) and again in 1978 to include disabilities other than physical ones. *L.* 1978, *c.* 137, § 3. Consistent with that approach, we have held that the overarching goal of LAD to eliminate the cancer of discrimination is to be achieved through a liberal construction of its provisions. *Dale v. Boy Scouts of America*, 160 *N.J.* 562, 734 *A.*2d 1196 (1999), *rev'd*, 530 *U.S.* 640, 120 *S.Ct.* 2446, 147 *L. Ed.*2d 554 (2000).

In expanding the scope of LAD's protections, the Legislature also recognized that certain handicapped persons could be legitimately precluded from performing certain tasks due to their conditions. *Andersen, supra*, 89 *N.J.* at 496, 446 *A.*2d 486. As a result, although the statute prohibits any unlawful employment practice against a handicapped person, its provisions do not apply if "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5-4.1. Moreover, LAD does not

> prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards.
> [*N.J.S.A.* 10:5-2.1.]

Thus, although it prohibits discriminatory employment practices, LAD acknowledges the right of employers to manage their businesses as they see fit.

New Jersey courts have traditionally sought guidance from the substantive and procedural standards established under federal law. Specifically, our courts have adopted the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L. Ed.*2d 668 (1973), to prove

disparate treatment under LAD. *See Peper, supra,* 77 *N.J.* at 83, 389 *A.*2d 465; *Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 569 *A.*2d 793 (1990). Under that framework, a plaintiff must first prove a *prima facie* case of discrimination. *Andersen, supra,* 89 *N.J.* at 492, 446 *A.*2d 486. To do so, a plaintiff must show that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person. *Ibid.* The establishment of a *prima facie* case gives rise to a presumption of discrimination. *Id.* at 493, 446 *A.*2d 486.

Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Ibid.* After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. *Ibid.* To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent. *Erickson, supra,* 117 *N.J.* at 561, 569 *A.*2d 793 (holding that an "employee can be fired for a false cause or no cause at all. That firing may be unfair, but it is not illegal"). Thus, under the *McDonnell Douglas* framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts. *Andersen,* 89 *N.J.* at 493, 446 *A.*2d 486.

The *McDonnell Douglas* test is not designed for rigid application. *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 596, 538 *A.*2d 794 (1988). The precise elements of a *prima facie* case must be tailored to the particular circumstances. *Ibid.* In *Clowes,* we refined the *McDonnell Douglas* analysis to address a case involving the discriminatory discharge of a handicapped person:

[T]he *prima facie* case is established as follows: the employee must prove "[1] that he was [handicapped], [2] that he was performing his job at a level that met his

employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left."

Once the *prima facie* case has been established, the *McDonnell Douglas* analysis is followed in all other respects.

[*Id.* at 597, 538 *A.*2d 794. (citations omitted) ].

Under the *Clowes* framework, the threshold inquiry in a handicapped discrimination discharge case is whether the plaintiff in question fits the statutory definition of "handicapped." *N.J.S.A.* 10:5–5(q) states:

"Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.

Pursuant to *N.J.S.A.* 10:5–5(q), there are two specific categories of handicap: physical and non-physical. The physical and non-physical clauses of the statute are distinct from each other and provide separate ways of proving handicap. Rosemary Alito, *New Jersey Employment Law,* § 4–14:1, 170 (2d ed.1999); *Clowes, supra,* 109 *N.J.* at 594, 538 *A.*2d 794 (stating that an alcoholic might suffer from "either a 'physical disability or infirmity ... which is caused by illness' or from a 'mental or psychological ... disability' ... or both").

To meet the physical standard, a plaintiff must prove that he or she is (1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy. *N.J.S.A.* 10:5–5(q). By way of example, but not limitation, the following are included within the notion of physical handicap:

Any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device.

*[Ibid.]*

To meet the non-physical standard, a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. *Alito, supra, New Jersey Employment Law,* § 4–14:1 at 170; *Clowes, supra,* 109 *N.J.* at 594, 538 *A.*2d 794.

The term "handicapped" in LAD is not restricted to "severe" or "immutable" disabilities and has been interpreted as significantly broader than the analogous provision of the Americans with Disabilities Act (ADA). *Failla v. City of Passaic,* 146 *F.*3d 149, 154 (3d Cir.1998) (noting that LAD provides a "lower standard" than ADA because "the LAD definition of 'handicapped' does not incorporate the requirement that the condition result in a substantial limitation on a major life activity"). Although other courts have addressed the ability of an obese plaintiff to meet the handicap standard of LAD, *Gimello v. Agency Rent–A–Car Systems, Inc.,* 250 *N.J.Super.* 338, 362, 594 *A.*2d 264 (App.Div.1991) (obese plaintiff satisfied definition of LAD), we have not previously spoken on that issue.

Where the existence of a handicap is not readily apparent, expert medical evidence is required. *See Clowes, supra,* 109 *N.J.* at 591–93, 538 *A.*2d 794; *Rogers v. Campbell Foundry,* 185 *N.J.Super.* 109, 112, 447 *A.*2d 589 (App.Div.1982). Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving the specific elements of each test contained in the statute. *See, e.g., Clowes, supra,* 109 *N.J.* at 591–93, 538 *A.*2d 794 (addressing testimony of medical director of an alcoholism treatment center, as part of its discussion of causation elements of both tests); *Enriquez, supra,* 342 *N.J.Super.* at 521, 777 *A.*2d 365 (holding plaintiff's course of treatment to be sufficient proof of his disability, but finding record silent as to

proofs supporting second and third prongs of "psychological handicap" test). Most importantly, regardless of what category of handicap, physical or non-physical, that is invoked by a plaintiff, each and every element of the relevant statutory test must be satisfied. Our analysis proceeds with that background in mind.

## IV.

We turn first to Fowler's claim that Viscik failed to prove she was handicapped within the meaning of LAD. We agree with Fowler that, at least at one point, there was a miscue when the Appellate Division linked elements from the two distinct LAD standards. It did so by relating Viscik's "physical disability" to the "physiological condition" language that appears in the non-physical disability clause of the statute. We note, however, that the trial court did not make that error in charging the jury; the trial court specifically advised the jury of the distinct ways in which a handicap could be established. The question presented, therefore, is whether the Appellate Division correctly concluded that the evidence supported the jury verdict that Viscik is handicapped.

We think it did. Viscik's testimony, medical history, and her expert's opinion fully support the finding that she established a physical handicap within the meaning of LAD. According to her expert, she is morbidly obese, that is, suffering from disease or pathology as a result of her obesity, and that her obesity-based arthritis, heart condition and obstructive lung disease are clearly "physical infirmities" under the first prong of the physical handicap test. The second prong of that test requires the infirmity to be "caused by bodily injury, birth defect or illness." On that point, Dr. Shen testified that Viscik's metabolic condition is genetic, that she suffered from it since birth, and that it is a direct cause of the obesity-based infirmities. Additionally, Viscik testified about the limits that her morbid obesity imposes in relation to her knee. She verified her inability to move around quickly and need for a cane. She also explained the effects of her asthma and

shortness of breath. Dr. Shen, moreover, attested to each of those limitations. We are satisfied, therefore, as was the Appellate Division, that the evidence supported the jury's finding with regard to Viscik's handicap.

## V.

We turn next to the jury instruction errors alleged by Fowler. "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." *Rendine v. Pantzer*, 276 *N.J.Super.* 398, 431, 648 *A.*2d 223 (App. Div.1994). In accordance with that principle, a jury charge must correctly state the applicable law, outline the jury's function and be clear in how the jury should apply the legal principles charged to the facts of the case at hand. *Velazquez ex rel. Velazquez v. Portadin*, 163 *N.J.* 677, 688, 751 *A.*2d 102 (2000). An incorrect jury charge, however, constitutes reversible error only if the jury could have come to a different result had it been correctly instructed. *Ibid.* Moreover, in construing a jury charge, a court must examine the charge as a whole, rather than focus on individual errors in isolation. *Ryder v. Westinghouse Elec. Corp.*, 128 *F.*3d 128, 137 (3d Cir.1997). Stated differently, an appellate court must consider the language surrounding an alleged error in order to determine its true effect. *See, e.g., Ibid.* (considering sentence and paragraphs following erroneous sentence to be correct statements that negate effect of incorrect statement).

## A.

The trial court instructed the jury that Fowler had a duty to reasonably accommodate Viscik's handicap and the jury charge is rife with references to that premise. Prior to charging the jury regarding the requirements for a *prima facie* case, for example, the court informed it that the reasonable accommodation concept could be used to determine whether Fowler's proffered reason for Viscik's dismissal was pretextual:

> One of the things you can take into account in that regard is whether there was a reasonable accommodation that was offered or considered ... in considering ... whether the plaintiff has shown ... the assertions of the employer are mere pretext.

The court again raised the issue of reasonable accommodation, in the context of describing the fourth prong of the test for a *prima facie* case:

> And the final thing she must show is that the challenged employment decision ... took place under circumstances that give rise to an inference of unlawful discrimination, either because—either because it was filled by someone else ... or because it might well have been that a reasonable accommodation might well have been afforded ... and such reasonable accommodation was not offered.

Finally, the court gave an extensive charge on reasonable accommodation in connection with the verdict sheet:

> And by "reasonable accommodation" I mean whether there was some course of action short of firing that would not impose an undue hardship upon the company to—that could have been done in order to permit her to perform the tasks that were a legitimate part of the job.

> On the other hand, if no accommodation could be made without undue hardship upon the company, or even if some accommodation or some steps that may have been taken, but wouldn't have been adequate to permit her to perform the essential functions of the job, then you would find that there would be no reasonable accommodation that could be afforded.

> The reasonable accommodation is simply one of the considerations that you can determine in evaluating the mind set or the state of mind of the company.

On this record, we find that those allusions to reasonable accommodation were erroneous. Reasonable accommodation is only an issue in a handicap discrimination case in two instances. The first is the case in which a plaintiff affirmatively pleads failure to reasonably accommodate as a separate cause of action. *See, e.g., Seiden v. Marina Associates,* 315 *N.J.Super.* 451, 462, 718 A.2d 1230 (Law Div.1998) (quoting *Wooten v. Acme Steel Co.,* 986 *F.Supp.* 524, 526–27 (N.D.Ill.1997) (noting there are "two distinct categories of disability discrimination" claims: (1) "a claim alleging discrimination ... including a failure to reasonably accommodate an employee's known disability" and (2) "a claim for disparate treatment discrimination, *i.e.,* treating a disabled employee differently ... because of his disability") (citations omitted)). The second is the case in which an employer, rather than defending on

the grounds that the employee was terminated for legitimate, non-discriminatory reasons, proffers the employee's inability to perform the job as a defense. *See, e.g., Svarnas v. AT & T Communications,* 326 *N.J.Super.* 59, 74–75, 740 *A.*2d 662 (App.Div.1999) ("An exception to accommodation exists where an employer reasonably determines that an employee because of a handicap cannot presently perform the job even with an accommodation.")

Neither case was presented here. This was a pretext case, not a reasonable accommodation case and the law clearly distinguishes between those theories. Viscik neither pled reasonable accommodation nor requested any such accommodation from Fowler, as the law requires. Moreover, Fowler never argued that a reasonable accommodation was impossible. Rather, Fowler chose to stand or fall on the assertion that Viscik's work ethic was poor. If that contention was true, Fowler had no duty to reasonably accommodate her. If it was not true, and the jury determined that Viscik was terminated because of her handicap, Fowler would be liable, having abandoned the defense that Viscik could not be accommodated.

In our view, the reasonable accommodation charge, objected to below (*Rule* 2:10–2), was prejudicial to Fowler. The charge essentially focused the jury's attention on a claim not at issue in the case and mixed two theories, pretext and reasonable accommodation, that are completely and purposefully distinct from one another. More importantly, it held Fowler to a standard on which no proofs had been offered. Under those circumstances, a new trial is warranted.

### B.

Both parties and the Appellate Division agree that the trial court erred in instructing the jury to assess Fowler's reasons for terminating Viscik under an objective employer standard. Fowler's sticking point is a narrow one: that that error, which was not objected to, was capable of producing an unjust result. In light of our ruling regarding a new trial, it is unnecessary for us to

address the issue. We choose, however, to comment on it because it will likely re-emerge at the new trial.

 The *McDonnell Douglas* framework utilizes both subjective and objective employer standards at different stages of its analysis. Critically, those standards are distinct and not interchangeable. Each has a specific place in the framework. Thus, in addressing the second prong of *McDonnell Douglas*, as modified by *Clowes*, the standard is an objective one: was the employee meeting the employer's legitimate or reasonable expectations. *See, e.g., Clowes, supra,* 109 *N.J.* at 600, 538 *A.*2d 794. However, in answering the overarching question of whether the employer's proffered non-discriminatory reason for discharge was pretextual, the fact-finder is required to consider the employee's performance or other qualities in light of the employer's subjective standards, including work ethic. *Ibid.* In that respect, the employer's subjective decision-making may be sustained even if unfair. *See Gorham v. AT & T Co.,* 762 *F.Supp.* 1138, 1145 (D.N.J.1991) (holding plaintiff's contention that she was not treated fairly because she was never informed of her unsatisfactory performance was irrelevant). The focus on subjectivity at the most critical stage of proof is consistent with LAD. *N.J.S.A.* 10:5–4.1; *Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 561, 569 *A.*2d 793 (1990) (holding that an "employee can be fired for a false cause or no cause at all. That firing may be unfair, but it is not illegal"); *Andersen, supra,* 89 *N.J.* at 496, 446 *A.*2d 486 (1982) ("There should be no second-guessing the employer").

Here, the trial court charged the jury twice with respect to the standard by which it should analyze Fowler's decision to fire Viscik. The first charge that imported an objective standard was proper within the context of the second prong of the *prima facie* case:

In addition to showing by a preponderance of the evidence that she is handicapped, the plaintiff is required to establish to your satisfaction by a preponderance of the evidence that she was performing the job at a level that met a reasonable expectation of the employer.

However, after describing Viscik's ultimate burden, the court mistakenly utilized the "objective, reasonable employer" standard instead of the proper subjective standard:

> However, again, these are the requirements that you are to—that the plaintiff must satisfy in order to recover under the act. You are to consider and assess all of the disputed evidence in the case and determine whether plaintiff has shown by a preponderance of the evidence that she is handicapped, that she was performing the job at a level that met the legitimate expectations of the employer.
>
> And in that sense, you must look at the employer as an objective employer, looking at what a reasonable or theoretical employer would find to be reasonable under the circumstances, as opposed to any subjective evaluation specifically of the employer.

Clearly, there is a significant difference between reviewing an employment action from the perspective of a theoretical, reasonable employer and that of a subjective, individual employer. Actions that could not pass muster under the former might well be sustained under the latter. In short, instructing the jury regarding the proper standard was critical to the outcome. On remand, the charge should be framed properly.

## VI.

The judgment of the Appellate Division is reversed. The matter is remanded for retrial in accordance with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—6.

*Opposed*—None.