**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5647-17T2

DIANA STEVENS,

     Plaintiff-Appellant,

v.

COUNTY OF HUDSON, and
NUZHAT IQBAL, improperly
pled as NUZHAT IGBAL,

     Defendants-Respondents.

_____

Submitted December 16, 2019 – Decided January 15, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3792-16.

Eldridge Hawkins, attorney for appellant.

Chasan Lamparello Mallon & Cappuzzo, attorneys for respondents County of Hudson, and Nuzhat Iqbal, in her official capacity only (Cindy Nan Vogelman, of counsel and on the brief; Qing Hua Guo, on the brief).

Weiner Law Group LLP, attorneys for respondent Nuzhat Iqbal, in her individual capacity (Jacqueline A.

DeGregorio, of counsel and on the brief; Julia O. Donohue, on the brief).

PER CURIAM

Diana Stevens (plaintiff) appeals from two July 13, 2018 orders granting summary judgment in favor of County of Hudson (County) and Nuzhat Iqbal (Iqbal)[1] in her official capacity and individual capacity (collectively defendants). We affirm.

In August 2005, plaintiff began working for the County as a senior personnel technician in the Personnel Department at Meadowview Psychiatric Hospital (the Hospital). She reported to Iqbal, the Hospital Administrator, from the start of her employment until October 2014, when she started reporting to Chief Nursing Officer Alice Agecha. In 2011, Charulata Kachalia (Kachalia), one of the personnel clerks supervised by plaintiff, told Iqbal that she wanted to resign or transfer because of how plaintiff treated her. The County investigated Kachalia's complaint, and a conflict resolution meeting was conducted between Iqbal, Kachalia, and plaintiff.

---

[1] Defendant Iqbal is improperly pled in plaintiff's complaint and briefs as "Igbal."

Shortly thereafter, Iqbal issued plaintiff a written warning for neglect of duty, incompetence, and conduct unbecoming a public employee. Plaintiff was on leave for three weeks, during which Iqbal supervised the department. She observed that plaintiff maintained the department in a disorganized fashion, with "coffee and food stain[ed]" confidential documents strewn about the room. Plaintiff also failed to file disciplinary paperwork and employee performance evaluations, failed to timely submit timesheets, and made significant payroll errors. Iqbal prepared a remediation plan for plaintiff.

On May 17, 2013, plaintiff received a Notice of Minor Disciplinary Action for failing to follow up on an employee's leave, which resulted in a mistaken continuation of health benefits by the County. She was charged with: (1) neglect of duty; (2) incompetence, inefficiency or failure to perform duties; (3) insubordination; and (4) conduct unbecoming a public employee. She was suspended for two days. Iqbal continued to receive complaints about plaintiff's management of the department, and Kachalia complained to Iqbal almost daily, while the other clerk came to Iqbal in tears stating that "she cannot take it anymore."

In August 2014, the new Hospital Medical Director told plaintiff that the nutritionist Liliya Racz (Racz) was being paid for more hours than she actually

worked. Plaintiff informed Iqbal, who said that she would investigate. Iqbal was satisfied that there was no discrepancy and told plaintiff that the issue was resolved. But in October 2014, plaintiff brought disciplinary charges against Kachalia and recommended that she be suspended for two days. The Deputy Director of the Department of Health & Human Services (the DHHS) investigated and found that no discipline was warranted against Kachalia.

At a morning meeting on October 10, 2014, plaintiff allegedly placed a file in front of Iqbal and stated "my staff said you have been behind closed doors so they could not have the paperwork and payroll signed." Plaintiff was issued a Notice of Minor Disciplinary Action, and she was suspended for three days for insubordination, incompetence, and conduct unbecoming of a public employee. The Notice stated that her conduct was inappropriate for the setting, and that she failed to follow Iqbal's directive regarding how to best access her. Plaintiff appealed the discipline and the matter was forwarded to the Director of the DHHS, Darice Toon (Toon). Toon upheld two of the three charges—insubordination and conduct unbecoming a public employee—and sustained the suspension. Plaintiff did not appeal this decision to the Civil Service Commission.

4

When the Pulaski Skyway was closed for repairs in 2014, plaintiff was permitted to work an earlier shift, but Iqbal told her that they would revisit the issue in six months. On October 16, 2014, Iqbal informed plaintiff that she would resume her original work schedule. Plaintiff claims that this was in retaliation for the Racz timesheet incident. But she also acknowledged that Iqbal was permitted to adjust her hours. Additionally, plaintiff alleges that some of her vacation time was denied in retaliation. She requested eight days off, but was only allowed one day because the request was not timely, as required by County policy.

On January 21, 2015, plaintiff filed an internal complaint against Iqbal. Plaintiff alleged that Iqbal created a hostile work environment based on four incidents: (1) plaintiff's three-day suspension; (2) Iqbal changing plaintiff's work hours back to her original schedule; (3) plaintiff's vacation time being cancelled due to a staff shortage; and (4) plaintiff receiving extra work.

In September 2015, plaintiff received a Preliminary Notice of Disciplinary Action (PNDA) for (1) incompetence, inefficiency, or failure to perform duties; (2) neglect of duty; (3) insubordination; (4) conduct unbecoming a public employee; and (5) other sufficient cause. The PNDA cited fifteen different infractions, and stated that plaintiff "failed, neglected and/or refused to perform

5

her duties and/or has performed said duties in a less than satisfactory manner over a protracted period of time. The performance of [plaintiff] has not improved, despite consultation, coaching, training and discipline."

A hearing before an outside officer was conducted over the course of five days. Plaintiff was represented by counsel who cross-examined County witnesses. At the conclusion of the County's case, plaintiff withdrew her appeal. But, the hearing officer still rendered a decision, determining that the County proved ten of the fifteen infractions, and finding plaintiff was "guilty of failure to perform her duties either through incompetence or inefficiency," and neglect of duty. The hearing officer stated, "[h]er failures resulted in cost to the County in additional overtime and the inefficient retention and layoff of temporary employees. Her actions in allowing documents, some of which are certainly confidential and may even be privileged, to remain loose and unsecured is of serious concern." The hearing officer concluded that plaintiff:

> [D]id not respond to the counselling by demonstrating an improvement in her work. She continued to exhibit a lax attitude about her job responsibilities during the period of time covered by these [s]pecifications. . . . Given the number of items and the seriousness of the circumstances, . . . suspension is warranted.

The hearing officer determined that the appropriate penalty would be one month without pay, but with the continuation of benefits. Plaintiff received a Final

6

Notice of Disciplinary Action (FNDA) on November 21, 2016, which she did not appeal.

On September 21, 2016, plaintiff filed a complaint against the County and Iqbal in her official and individual capacities. The complaint alleged: (1) discrimination based on race, hostile work environment and retaliation under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49; (2) interference with beneficial economic interest, breach of implied covenant of good faith and fair dealing, violation of the New Jersey Constitution; (3) violation of the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2; (4) violation of the N.J. Const., art. 1, ¶ 1, 6, 18, and 19, and Peper v. Princeton University Board of Trustees, 77 N.J. 55 (1978); (5) misuse and abuse of process; and (6) violation of the New Jersey Racketeering Influenced and Corruption Organizations Act (RICO), N.J.S.A. 2C:41-1 to -6.2.

After discovery, the County defendants moved for summary judgment. Iqbal also moved for summary judgment in her individual capacity. Plaintiff cross-moved for partial summary judgment. Judge Martha D. Lynes heard oral argument, and granted summary judgment in favor of the County defendants and Iqbal individually, denied plaintiff's cross-motion, and dismissed plaintiff's complaint with prejudice.

A-5647-17T2

When reviewing an order granting summary judgment, we apply "the same standard governing the trial court." Oyola v. Xing Lan Liu, 431 N.J. Super. 493, 497 (App. Div. 2013). A court should grant summary judgment when the record reveals "no genuine issue as to any material fact" and "the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We owe no special deference to the motion judge's conclusions on issues of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We consider the facts in a light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).

On appeal, plaintiff generally argues that the trial judge applied an incorrect legal standard and did not issue an opinion that abides by court rules; that her LAD, tort, and constitutional claims should not have been dismissed; and that Iqbal is individually liable.

I.

Plaintiff has brought claims against Iqbal in both her official and individual capacities. "A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in [her]," N.J.S.A. 59:3-2, "for injury caused by [her] instituting or prosecuting any judicial or administrative proceeding within the scope of [her] employment," N.J.S.A. 59:3-8, or "for an injury caused by [her] misrepresentation" while she is "acting in the scope of [her] employment." N.J.S.A. 59:3-10. But, nothing shall "exonerate a public employee" if her "conduct was outside the scope of [her] employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14. Here, Iqbal was acting within the scope of her employment, and plaintiff has not provided evidence to the contrary.

Plaintiff maintains that Iqbal is not entitled to qualified immunity under the NJCRA. "The doctrine of qualified immunity operates to shield 'government officials performing discretionary functions generally . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Morillo v. Torres, 222 N.J. 104, 116 (2015) (alteration in original) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Iqbal contends that qualified

immunity was designed to protect employees like her, because to the extent that she was involved, "she was within the scope of her employment, following the relevant policies of her employer, and deprived no one of any kind of civil right under color of law without due process."

Plaintiff alleges that Iqbal is individually liable under the LAD because she held a supervisory position and aided or abetted in the wrongful conduct. See Herman v. Coastal Corp., 348 N.J. Super. 1, 27 (App. Div. 2002); Cicchetti v. Morris Cty. Sheriff's Office, 194 N.J. 563, 594 (2008). Our Court explained that co-employees "could not aid or abet their own acts." Cicchetti, 194 N.J. at 573. Plaintiff has not presented any evidence to defeat the entry of summary judgment. Thus, we affirm as to Iqbal in her individual capacity.

II.

The LAD "guarantees that all citizens be afforded the civil rights promised by the State Constitution." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 445-46 (2005). The statute's goal is to eradicate the "'cancer of discrimination.'" Id. at 446 (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). The LAD provides that it is unlawful

> [f]or an employer, because of the race, creed, color, . . . sex, . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge . . . , from employment such individual or to discriminate against such

individual in compensation or in terms, conditions or privileges of employment[.]

[N.J.S.A. 10:5-12(a).]

"The LAD prevents only unlawful discrimination; it does not prevent the termination or change of employment of any person who 'is unable to perform adequately the duties of employment, nor [does it] preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards.'" Zive, 182 N.J. at 446 (alteration in original) (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002)). That is, "the LAD acknowledges the authority of employers to manage their own businesses." Ibid.

> [I]t is not the purpose of the LAD "to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards[.]"
>
> [Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 302-03 (App. Div. 2000) (quoting N.J.S.A. 10:5-2.1).]

Further, "[a]ll employment discrimination claims require the plaintiff to bear the burden of proving the elements of a prima facie case." Victor v. State, 203 N.J. 383, 408 (2010).

New Jersey has adopted the federal standard that the Supreme Court of the United States proclaimed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 595 (1988); Zive, 182 N.J. at 447. In Clowes, our Supreme Court held that an employee must prove four elements to show a prima facie case of discrimination: (1) that he or she was in a "protected group"; (2) that he or she was performing her job at a level that "met his [or her] employer's legitimate expectations"; (3) that he or she "nevertheless was fired"; and (4) that the defendant "sought someone to perform the same work after he [or she] left." 109 N.J. at 597 (internal quotation marks and citation omitted).

Our Supreme Court further explained that "the 'employer's legitimate expectations' is an objective and not a subjective standard," reserving "the issue of the employer's subjective expectations for the pretext stage of a LAD case." Zive, 182 N.J. at 454 (citation omitted). To satisfy that objective standard, "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." Ibid. After the plaintiff produces such evidence, the burden shifts to the defendant to "rebut the presumption of undue discrimination by articulating some legitimate,

nondiscriminatory reason for the employee's rejection." Andersen v. Exxon Co., 89 N.J. 483, 493 (1982).

Plaintiff, an African American woman, brought claims for racial discrimination, retaliation, and hostile work environment. First, a claim of racially disparate treatment requires the employee to prove a discriminatory motive, which in some circumstances can be inferred from the disparate treatment itself. See Peper, 77 N.J. at 81. Plaintiff must "'demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision.'" Smith v. Millville Rescue Squad, 225 N.J. 373, 394 (2016) (quoting Bergen Commercial Bank v. Sisler, 157 N.J. 188, 208 (1999)). Relevant evidence would include proof "'that white employees involved in acts . . . of comparable seriousness . . . were nevertheless retained[.]'" Jason, 329 N.J. Super. at 305 (first and second alterations in original) (quoting McDonnell Douglas, 411 U.S. at 804).

Here, plaintiff claims that her suspensions were based on her race, but she fails to provide a "direct causal connection" between the two. Smith, 225 N.J. at 394 (internal quotation marks and citation omitted). She has also failed to provide evidence that non-African American employees charged with

comparable infractions received dissimilar or less serious discipline. The judge aptly explained that, "[p]laintiff has not explained or shown through any proofs as to why the decision to suspend her for three [days] was based on her membership [in] a protected class. Defendants have demonstrated that the disciplinary decisions made regarding . . . [p]laintiff were made with all procedural and substantive due process[.]"

Next, plaintiff alleges that she was a victim of unlawful retaliation as a result of the Racz timesheet incident. The prima facie elements of a retaliation claim under the LAD require a plaintiff to demonstrate that: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Victor, 203 N.J. at 409. After the plaintiff establishes the prima facie elements, the defendant must provide a legitimate, non-retaliatory reason for its decision. Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 1995). "Thereafter, the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." Ibid. "Temporal proximity,

standing alone, is insufficient to establish causation." Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002).

Here, plaintiff claims that the Racz timesheet incident was an unlawful activity. But, after plaintiff informed Iqbal about this situation, it was investigated and determined that unlawful activity did not occur. Again, plaintiff does not make a connection to the purported retaliation. See N.J.S.A. 10:5-12(d). In fact, defendants provided legitimate non-discriminatory reasons for each of the alleged retaliatory actions. See Romano, 284 N.J. Super. at 549. Plaintiff's three-day suspension was because of her conduct at a meeting, and it was upheld by a department head who is also an African American woman. Her shift changed back to her original schedule, something that Iqbal foreshadowed could occur. Plaintiff's vacation time was denied because she did not follow County policy. Plaintiff asserts that she was given extra duties, but could not specify which duties. And the one-month suspension was upheld by a hearing officer who found ten proven incidents of poor job performance.

Plaintiff alleges that there was a hostile work environment, which "occurs when an employer or fellow employees harass an employee because of his or her [protected status] to the point at which the working environment becomes hostile." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993). This claim

requires a showing that the harassing conduct "(1) would not have occurred but for the employee's [protected status]; and it was (2) severe or pervasive enough to make a (3) reasonable [person in the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Cutler v. Dorn, 196 N.J. 419, 430 (2008) (quoting Lehmann, 132 N.J. at 603-04). Whether the conduct is "severe or pervasive" is based on the totality of the circumstances. Taylor v. Metzger, 152 N.J. 490, 506 (1998).

Plaintiff has not established that there was a hostile work environment. She has not shown that defendants conduct was so "severe or pervasive" as to make a reasonable person in plaintiff's situation believe that "the conditions of employment are altered and [that the] working environment is hostile or abusive." Cutler, 196 N.J. at 430 (internal quotation marks and citation omitted). She cannot prove that the requisite level of hostility was met nor that defendant would not have acted but for her protected status. Ibid. As such, the judge properly granted summary judgment.

### III.

Plaintiff also alleges interference with economic advantage, breach of the implied covenant of good faith, abuse and misuse of process, and casting her in a false light.

16

The tort of interference with a prospective economic advantage requires: "(1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." DiMaria Const., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001). In her merits brief, plaintiff does not discuss or analyze these elements, or provide facts that bolster her claims.

Plaintiff also discusses the "implied covenant of good faith," and that there was evidence of a breach because of "theft of public moneys and retaliation against the one who reported same[.]" Plaintiff does not highlight any provisions in the County employee handbook that defendants have breached, nor does she explain if defendants violated any Civil Service laws.

Abuse of process is "the misuse or misapplication of the legal procedure in a manner not contemplated by law." Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1036 (3d Cir. 1988). Here, plaintiff was aptly provided with all opportunity to be heard and to appeal the suspensions, in accordance with Civil Service laws and regulations.

False light is an invasion of privacy tort that involves "publicity that unreasonably places the other in a false light before the public." Romaine v.

17

Kallinger, 109 N.J. 282, 293 (1988) (internal quotation marks and citations omitted).  When the false light claim is directed toward a public official, a plaintiff has the additional burden of proving actual malice.  See DeAngelis v. Hill, 180 N.J. 1, 19 (2004).  "A public entity is not liable for the acts or omissions of a public employee constituting . . . actual malice[.]"  N.J.S.A. 59:2-10.  "[A] public corporation, such as a city or other public body, by reason of its being an artificial legal entity created by law to perform limited governmental functions, cannot entertain malice, as a public corporation."  O'Connor v. Harms, 111 N.J. Super. 22, 26 (App. Div. 1970).  Plaintiff argued before the judge that defendants placed her in a false light by publishing her suspensions to the Civil Service Commission, but she does not repeat this allegation in her merits brief.  Nor is there any explanation proffered as to how this demonstrates actual malice.  Thus, plaintiff's tort claim lacks sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

## IV.

N.J.S.A. 10:6-2(c) provides:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those

18

> substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

To establish a violation of the NJCRA, a plaintiff must prove that: (1) "the Constitution or laws of this State" conferred a substantive right; (2) the defendant deprived the plaintiff of this right; and (3) the defendant was "'acting under color of law'" when it did so. Tumpson v. Farina, 218 N.J. 450, 473 (2014) (quoting N.J.S.A. 10:6-2(c)). The NJCRA was modeled after 42 U.S.C. § 1983, and federal courts interpret the NJCRA analogously to § 1983. Trafton v. City of Woodbury, 799 F.Supp.2d 417, 443 (D.N.J. 2011). "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). Policy is made via a "decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action[.]" McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) (first alteration in original) (internal quotation marks and citation omitted). Customs are "practices of state officials [that are] permanent[] and well-settled" as to constitute law. Ibid. (internal quotation marks and

citation omitted). Further, there must be causation between the municipality's actions and the constitutional injury. City of Canton v. Harris, 489 U.S. 378, 394 (1989). Here, plaintiff cannot highlight a County policy or custom that would expose it to liability. She also has not shown that Iqbal was a policymaker. This claim is unsubstantiated and not supported by any proffered evidence; instead plaintiff makes a conclusory, blanket statement regarding disparate treatment. Thus, her NJCRA claim was properly dismissed.

V.

Plaintiff further alleges that defendants violated her constitutional rights. Again, plaintiff includes conclusory statements, arguing that defendants deprived her of equal protection and engaged in discriminatory behavior that prevented her from obtaining gainful employment.

Our Supreme Court "has the power to enforce rights recognized by the New Jersey Constitution, even in the absence of implementing legislation." Peper, 77 N.J. at 77. In such a circumstance, there are two theories of relief: disparate treatment and disparate impact. Id. at 81. Disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere

20

fact of differences in treatment." Ibid. Disparate impact "involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Id. at 81-82 (internal quotation marks and citation omitted). Disparate impact claims do not require proof of a discriminatory motive. Id. at 82. The plaintiff has to show that "similarly situated" employees—that is, "those persons possessing equivalent qualifications and working in the same job category as plaintiff"—were treated differently than the plaintiff. Id. at 84-85. The Court stated that it sympathized with the plaintiff, but that "before [it could] legitimately find her employer's conduct towards her to constitute discrimination . . . , a more persuasive showing must be made that the decision not to promote her was based upon something other than a bona fide evaluation of her qualifications for the position." Id. at 86 (emphasis omitted).

Here, plaintiff fails to show that the decision to suspend her was based on something other than a bona fide evaluation of her job performance and disciplinary issues. She accuses defendants of constitutional violations, but does not provide proof of other employees who have been treated more favorably on the basis of race other than mere speculation and conjecture based upon the salaries of other employees, the fact that their work hours were not shifted back

21

like hers, or that they may have also had issues with their subordinates. None of this is indicative of disparate treatment or disparate impact under the law.

VI.

New Jersey's RICO Act is a criminal statute that enables civil relief for "[a]ny person damaged in his business or property by reason of a [RICO] violation[.]" N.J.S.A. 2C:41-4(c). "Racketeering activity" under the statute includes theft offenses, fraudulent practices, and other criminal acts. N.J.S.A. 2C:41-1(a). To be liable under RICO, an entity must have known of the existence and criminal nature of the enterprise. See State v. Ball, 141 N.J. 142, 186-87 (1995).

"A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10. "[T]he existing law and public policy [is] that a public entity should not be vicariously liable for such conduct of its employees." Trafton, 799 F.Supp.2d at 444 (citation omitted).

Here, plaintiff does not cite to a single case or to the statute. Moreover, she claims defense counsel is unfamiliar with RICO's requirements and states that had counsel "needed more explanation, [they] should have requested same

in discovery." But plaintiff failed to prove the elements of RICO. Therefore, summary judgment should not be overturned.

To the extent that we have not addressed any of the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5647-17T2