**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3196-21

THOMAS A. FREDELLA and
KELLY A. KEARNY,

     Plaintiffs-Appellants,

v.

TOWNSHIP OF TOMS RIVER,
STATE OF NEW JERSEY
DEPARTMENT OF
TRANSPORTATION, and
STATE OF NEW JERSEY
DEPARTMENT OF THE
TREASURY-FLEET
MANAGEMENT,

     Defendants-Respondents.

_____

> Argued January 31, 2024 – Decided February 22, 2024
>
> Before Judges Firko, Susswein, and Vanek.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-3198-17.
>
> Phillip C. Wiskow argued the cause for appellants (Gelman Gelman Wiskow & McCarthy, LLC, attorneys; Phillip C. Wiskow, on the briefs).

Thomas E. Monahan argued the cause for respondent Township of Toms River (Dasti, McGuckin, McNichols Connors Anthony & Buckley, attorneys; Thomas E. Monahan, of counsel; Patrick F. Varga, on the brief).

PER CURIAM

This appeal arises out of a negligence lawsuit filed by plaintiffs Thomas A. Fredella (plaintiff)[1] and his now ex-wife, Kelly A. Kearney, against defendants Township of Toms River (the Township), State of New Jersey Department of Transportation (DOT), and State of New Jersey Department of the Treasury-Fleet Management arising out of a motor vehicle accident. On November 5, 2016, at 9:10 p.m., plaintiff struck a parked DOT truck that was responding to a call from the Toms River Police Department to remove a deer carcass from Route 37.

Plaintiff drove into the back of the DOT truck, resulting in severe injuries to his right leg. When emergency medical technicians (EMTs) arrived and had difficulty locating a vein to administer medication to plaintiff, he told them that he had used heroin earlier that day. The Township claimed plaintiff was

---

[1] In our opinion, "plaintiff" refers to Thomas A. Fredella.

2

A-3196-21

contributorily negligent and a proximate cause of the accident because he was inattentive while driving and was under the influence of heroin.

Prior to trial, plaintiff and Kearny reached a settlement with the DOT and the Department of the Treasury (the DOT settlement). A jury returned a verdict finding that all parties were responsible for the accident, allocating fault as follows: plaintiff sixty percent responsible; the Township twenty percent responsible; and the DOT twenty percent responsible. Based upon this verdict, plaintiff did not receive any award of damages.[2]

On appeal, plaintiff primarily challenges two trial court rulings, including the admission of the testimony of the Township's medical expert, Lawrence Guzzardi, M.D., without first holding a Frye/Daubert[3] hearing to determine whether the expert employed a reliable methodology. Dr. Guzzardi is an emergency room doctor and a toxicologist. Plaintiff filed three pre-trial motions objecting to Dr. Guzzardi testifying based on his expertise, arguing his opinion was an improper net opinion, and that the expert lacked the requisite expertise

---

[2]  Pursuant to New Jersey's comparative negligence statute, as set forth in N.J.S.A. 2A:15-5.1, "a plaintiff who is found to be more than fifty percent at fault is entitled to no recovery." Brodsky v. Grinnel Haulers, 181 N.J. 102, 109 (2004).

[3]  Frye v. United States, 293 F. 1013 (D.C. Cir. 1923); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

to offer testimony on the effect that heroin allegedly had on plaintiff's vision at the time of the accident. The trial court denied all of plaintiff's motions, finding Dr. Guzzardi had the requisite knowledge, training, and expertise to opine plaintiff was under the influence of heroin at the time of the accident. Plaintiff also contends the trial court erred in providing the Model Jury Charge on settling defendants.

For the reasons that follow, we remand for further proceedings and more detailed findings by the trial court addressing each of the discrete factors set forth in Daubert, as adopted with certain conditions by our Supreme Court in the matter of In re Accutane Litig., 234 N.J. 340 (2018). We affirm, however, the trial court's decision to use the Model Jury Charge to instruct the jury on settling defendants.

## I.

We summarize the facts from the record most significant to the issues plaintiff has raised on appeal.

### A. The Accident

A motorist struck a deer while driving on Route 37 at approximately 7:00 p.m. on the day of plaintiff's accident. After the accident, its carcass lay across the right lane, with some innards and organs strewn into the center lane of the

A-3196-21

roadway. Officer Justin Lammer responded to the scene within five minutes, at 7:10 p.m. Lammer did not recall any details about the accident or seeing the deer and left the scene at approximately 7:54 p.m. At 8:12 p.m., DOT received a call from dispatch to remove the deer carcass.

At trial, Lammer agreed that per department policy, he was required to move animal carcasses to the side of the road if he could safely do so. Lammer stated if an officer could not move a carcass or any other type of obstruction from the road, the officer had to wait on the scene until the carcass was removed.

At 8:41 p.m. three DOT workers arrived—two in a pick-up truck with flashing lights and one in a safety truck with flashing lights and an arrow board—to direct traffic. The record is unclear as to whether the arrow board was lit at the time of the accident. The DOT workers did not set up any additional safety precautions, such as cones or signs. The DOT trucks were initially parked on the shoulder lane of Route 37, but about a minute before the accident, they moved off the shoulder and parked in the right lane to begin the carcass removal process.

Plaintiff drove onto Route 37 from an exit ramp off the Garden State Parkway. He recalled seeing taillights driving about "two football fields" ahead of him. After merging onto Route 37, plaintiff moved to the center lane, then

back to the right lane, when he struck the rear of the DOT safety truck.[4] Plaintiff testified he did not see any vehicles ahead of him before he hit the truck and did not see any lit signs or flashing lights.

Plaintiff sustained a severe open fracture in his lower right leg and had multiple breaks in the bone. Between November 2016 and February 2018, he underwent more than a dozen surgeries due to complications arising from infections and bone alignment. Ultimately, due to reoccurring risk of infection, plaintiff planned to have his leg amputated based on his doctor's recommendation.

B. Heroin Evidence

Plaintiff testified he told the EMTs he had used two bags of heroin the day of the accident, either late that morning or early that afternoon, because they had difficulty finding a vein to inject medication. According to plaintiff, the amount of heroin was the equivalent of drinking three beers and affected him for no more than thirty to forty-five minutes. Neither the police reports nor the EMT records noted plaintiff as being under the influence of any substance, but the EMT records noted that plaintiff had "pinpoint" pupils, measuring at two

_____

[4] Plaintiff presented testimony from an accident reconstruction expert who testified that regardless of plaintiff's lane changes or whether the arrow board was on, he did not have sufficient time to stop his vehicle and avoid the collision.

6

millimeters.[5] There were no laboratory tests confirming the levels of heroin in plaintiff's system at any time relevant to this matter.

On March 30, 2021, plaintiff and Kearny reached the DOT settlement. That same day, plaintiff moved in limine to preclude Dr. Guzzardi from testifying that plaintiff was under the influence of heroin at the time of the accident, that the heroin impaired his vision and contributed to the accident. Plaintiff contended that Dr. Guzzardi's opinion should not be presented to the jury because he did not establish that plaintiff's heroin use was a substantial contributing factor to the accident.[6] Plaintiff also moved to bar the Township from advising the jury that he, Kearny, and DOT reached a settlement. The trial court denied both motions, finding Dr. Guzzardi's reports did not constitute a net opinion and that the Model Jury Charges expressly required such instruction.

---

[5] The EMT records are contained in plaintiff's appendix but are difficult to read due to the poor quality of the copy. Thus, our summary of the EMT's findings is based on Dr. Guzzardi's testimony. Dr. Guzzardi testified that plaintiff's pupil size gradually increased to four millimeters when measured at the hospital.

[6] While plaintiff requested a Frye/Daubert hearing, his arguments on appeal center on the Frye standard for admissibility, i.e., that of general acceptance by the relevant scientific community. Frye, 293 F. at 1013-14. Regardless, now on appeal and at the time of trial, New Jersey utilizes a "methodology-based test for reliability" similar to the standard set forth by the United States Supreme Court in Daubert. In re Accutane Litig., 234 N.J. at 397.

A-3196-21

Subsequently, Dr. Guzzardi was deposed. Dr. Guzzardi opined that at the time of the accident, plaintiff was "under the influence of heroin." The expert based his opinion on plaintiff's admission he had injected heroin earlier the day of the accident and the EMT's notation that he had pinpoint pupils, meaning his pupils measured only two millimeters. When assessing if someone is under the influence of heroin, Dr. Guzzardi explained he looks at the patient's history, their clinical presentation, and laboratory tests.

Dr. Guzzardi testified that here, two of the three factors were satisfied because plaintiff had admitted to using heroin and presented with pinpoint pupils at the scene of the accident. Dr. Guzzardi stated morphine had a "half life of two to four hours," and that if plaintiff took heroin in the morning or early afternoon, it "would still be present in his body at the time of his accident and affecting the central nervous system." Dr. Guzzardi explained that heroin could affect alertness, judgment, reaction time, and night vision.

Dr. Guzzardi acknowledged there were unknown variables regarding plaintiff's level of intoxication, such as the exact time of the heroin injection, and whether any amount was in his system at the time of the accident, because no drug test was administered. A critical facet of Dr. Guzzardi's analysis was he did not know plaintiff's level of intoxication at the time of the accident and

8

to what extent it had impacted his driving. However, Dr. Guzzardi stated that plaintiff's pinpoint pupils sufficiently demonstrated that he remained "adversely affected by heroin" and that his pupil size negatively impacted his vision, which "adversely affected" his driving.

Dr. Guzzardi testified there are four potential causes for pinpoint pupils: severe brain hemorrhage; pilocarpine—a drug used to treat glaucoma; exposure to high levels of organophosphate toxins (like insecticides); and narcotics. Dr. Guzzardi stated pupils can measure from two millimeters to eight-and-a-half millimeters, and that the average pupil measured from three-and-a-half millimeters to seven millimeters.[7]

The size of plaintiff's pupils recorded at the scene of the accident—two millimeters—was significant to Dr. Guzzardi because he felt it restricted plaintiff's ability to see light and limited his peripheral vision. Because the accident occurred at night, Dr. Guzzardi elaborated that regardless of whether the safety truck had its lights on, "if your eyes are made small, pinpoint, your eyes cannot get enough light in." Dr. Guzzardi stated that narcotics impact the

---

[7]  Plaintiff's counsel cross-examined Dr. Guzzardi with the American Ophthalmological Society's definition of pinpoint pupils as measuring less than two millimeters, and normal pupils as measuring between two and eight millimeters.

eye's ability to adjust, and with pinpoint pupils, "you don't get enough light in." Dr. Guzzardi opined that the heroin impacted plaintiff's peripheral vision and might have been the reason why he did not notice the DOT truck directly ahead of him, especially in light of the fact plaintiff was changing lanes at the time.[8]

Although Dr. Guzzardi offered an opinion, he conceded that he is not an ophthalmologist and could not explain or quantify to what extent plaintiff's vision was impacted. And without bloodwork, Dr. Guzzardi could not determine whether plaintiff's heroin use adversely impacted his judgment or reflexes at the time of the accident.

Following Dr. Guzzardi's deposition, plaintiff again moved to bar his testimony at trial because plaintiff's expert—who did not testify—disputed Dr. Guzzardi's opinion that two-millimeter pupils qualify as pinpoint pupils. In addition, plaintiff argued that under New Jersey caselaw, a party's intoxication could not be introduced without supplementary evidence that the party's intoxication had contributed to the accident. The trial court denied plaintiff's motion, finding that any disagreement between the experts was a matter of

---

[8] Plaintiff testified that he used mirrors to change lanes because he drove a van for years and came to rely on mirrors when driving. Dr. Guzzardi commented that he did not know if plaintiff used mirrors out of habit or because he was a "chronic heroin user" and relied on mirrors because he always had pinpoint pupils.

weight, not admissibility, Dr. Guzzardi's testimony was sufficient to link plaintiff's admitted heroin use to his impaired driving, and the proffered testimony was not unduly prejudicial.

At his deposition, Dr. Guzzardi did not cite to any articles or studies in support of his opinion, which he stated was based on his clinical experience and review of plaintiff's medical records. When pressed on cross-examination on his failure to cite to any authority about heroin use and pupil size, Dr. Guzzardi answered this was "well known" to toxicologists and emergency physicians, and that "[e]very emergency physician knows that two-millimeter pupils are myotic pupils compatible with morphine abuse." When questioned whether this information was contained in a learned treatise, Dr. Guzzardi responded it was "such common knowledge that [he] did not cite it." Dr. Guzzardi added that he had "published . . . on the effect of morphine and opiates on pupil size" and had "testified about this [issue] before our Supreme Court."

In his second motion, plaintiff again argued that his expert disputed Dr. Guzzardi's definition of pinpoint pupils as measuring two millimeters. And, plaintiff asserted that regardless, his heroin use could not be introduced without supplemental evidence that he was intoxicated at the time of the accident, and his intoxication impaired his driving. The trial court denied the motion and

11

again held that any dispute about pupil size went to the weight of the testimony, not its admissibility. In addition, the trial court disagreed with plaintiff's interpretation of the caselaw, holding Dr. Guzzardi's testimony was sufficient to link plaintiff's admitted heroin use to his impaired driving. The trial court reiterated its prior finding that Dr. Guzzardi's opinion was not a net opinion and determined his testimony was not excludable under N.J.R.E. 403 because its probative value was not substantially outweighed by the risk of undue prejudice.

On April 21, 2022, plaintiff sent a letter to the trial court making his third motion requesting a <u>Frye</u>/<u>Daubert</u> hearing to ascertain the admissibility of Dr. Guzzardi's testimony. The trial court heard oral argument on the request that day and reserved decision. A week later, on April 28, 2022, the trial court issued an order accompanied by a written decision denying plaintiff's request for a <u>Frye</u>/<u>Daubert</u> hearing and concluding a pre-trial hearing was unnecessary because Dr. Guzzardi had the requisite knowledge, training, or expertise to opine that plaintiff was under the influence of heroin at the time of the accident, which impaired his ability to operate a motor vehicle.

The trial court found Dr. Guzzardi had the "appropriate credentials to offer the opinions expressed in his report," and he provided "sufficient 'whys and wherefores' in support of his opinion." The trial court noted plaintiff could raise

timely objections at trial about Dr. Guzzardi's "qualifications, foundation, scope," and the court's N.J.R.E. 403 ruling. The trial court further stated that an expert's opinion need not be based on "treatises or any type of documentary support but may include what the witness has learned from personal experience." The trial court did not make findings about Dr. Guzzardi's ability to testify as to the impact of opioids on vision. However, during trial, the trial court ruled, consistent with its prior decision, that Dr. Guzzardi's inability to quantify the extent to which plaintiff's pinpoint pupils impacted his vision went to the weight of his testimony, not its admissibility. This appeal followed.

II.

Our Supreme Court has instructed that in determining the admissibility of scientific expert testimony in civil, and now criminal cases, our trial courts must utilize a "methodology-based test for reliability" similar to the standard set forth by the United States Supreme Court in Daubert. In re Accutane, 234 N.J. at 397. This standard is as follows:

> Our view of proper gatekeeping in a methodology-based approach to reliability for expert scientific testimony requires the proponent to demonstrate that the expert applies his or her scientifically recognized methodology in the way that others in the field practice the methodology. When a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data,

from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable.

[Id. at 399-400.]

Applying this standard, our courts must consider "whether an expert's reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to facts in issue." Id. at 397 (citing Daubert, 509 U.S. at 591, 594-95; Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449 (1991)).

The trial court's role is not to "substitute its judgment for that of the relevant scientific community," but "to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." Id. at 414. Thus, experts "must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Id. at 417. Moreover, when an expert relies on scientific or medical studies, "the trial court should review the studies, as well as other information proffered by the parties, to determine if they are of a kind on which such experts ordinarily rely," and if they are "derived from a

14

sound and well-founded methodology that is supported by some expert consensus in the appropriate field."  Ibid.

When applying this standard, our judges should now address the multiple Daubert factors, a "'helpful—but not necessary or definitive—guide' for trial courts in New Jersey" to follow when assessing the reliability of scientific or technical expert testimony.  State v. Olenowski, 253 N.J. 133, 149 (2023) (quoting In re Accutane, 234 N.J. at 398).  These factors are as follows:

> (1) Whether the scientific theory can be, or at any time has been, tested;
>
> (2) Whether the scientific theory has been subjected to peer review and publication, noting that publication is one form of peer review but is not a "sine qua non";
>
> (3) Whether there is any known or potential rate of error and whether there exist any standards for maintaining or controlling the technique's operation; and
>
> (4) Whether there does exist a general acceptance in the scientific community about the scientific theory.
>
> [In re Accutane, 234 N.J. at 398 (citing Daubert, 509 U.S. at 593-95).]

The first enumerated Daubert factor—testability—relates closely to the dual components of the third factor, error rate and standards.  Testability is "a key question" that entails whether a theory or technique "can be (and has been) tested."  Daubert, 509 U.S. at 593.

The second <u>Daubert</u> factor—peer review and publication—is significant because submission of a methodology "to the scrutiny of the scientific community is a component of 'good science'" and "increases the likelihood that substantive flaws in methodology will be detected." <u>Ibid.</u>

The third <u>Daubert</u> factor concerns both the known or potential rate of error in testing the methodology as well as any standards for maintaining or controlling the methodology's operation. <u>Id.</u> at 594. As the Court noted in <u>Daubert</u>, a trial court "ordinarily" should account for the "known or potential rate of error" of a methodology. <u>Ibid.</u> In addition, a methodology is more reliable if it is governed by well-established standards for operation. <u>Ibid.</u> <u>See also</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 154-57 (1999) (rejecting as inadmissible an expert who had not consistently adhered to a protocol with appropriate standards).

Lastly, the fourth <u>Daubert</u> factor—general acceptance—(the former test of <u>Frye</u> is no longer the dispositive test since the Court has adopted the multifactor <u>Daubert</u> approach) is still pertinent. <u>Daubert</u>, 509 U.S. at 594-96; <u>In re Accutane</u>, 234 N.J. at 398.

As the Supreme Court stated in <u>In re Accutane</u>, 234 N.J. at 398, and again in <u>Olenowski</u>, these specific factors are not a rigid set of considerations for

16

ascertaining the reliability of a proffered expert's methodology. 253 N.J. at 149. Nonetheless, they provide an important framework for guiding the analysis. The trial court's consideration of each of these factors is integral to the appellate court's review of whether the trial court abused its discretion in concluding whether an expert's methodology was sufficiently reliable to be admitted to a jury. In re Accutane, 234 N.J. at 391.

In the matter under review, plaintiff contends that the trial court erred in admitting Dr. Guzzardi's testimony without first determining whether his opinion satisfied the Frye standard. Plaintiff also challenges the accuracy of the measurement of his pupils—and the definition of pinpoint pupils—arguing that this undermines Dr. Guzzardi's basis for concluding the pupil size meant plaintiff was under the influence of heroin at the time of the accident.

Plaintiff maintains an evidentiary hearing was necessary first to establish that Dr. Guzzardi correctly defined pinpoint pupils as measuring two millimeters, and second to determine whether there was scientific support for the proposition that pinpoint pupils are a sign the person is under the influence of opiates. Relatedly, plaintiff argues that Dr. Guzzardi's testimony was inadmissible because he could not quantify plaintiff's level of impairment and,

thus, could not determine whether his impairment was a substantial contributing factor for the accident.

In reviewing a trial court's decision on admission of expert testimony in a civil action, we apply an abuse of discretion standard. In re Accutane Litig., 234 N.J. at 392. This standard extends to the decision to conduct a pre-trial evidentiary hearing. Kemp by Wright v. State, 174 N.J. 412, 432 (2002). The trial court's ruling should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

The admission of expert testimony is generally governed by N.J.R.E. 702, which provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To satisfy this standard, the proponent of expert testimony must establish that: (1) the subject matter of the testimony is "beyond the ken of the average juror"; (2) the field of inquiry is "at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) the witness has "sufficient expertise" to offer

18

the testimony.  In re Accutane Litig., 234 N.J. at 349 (quoting State v. Kelly, 97 N.J. 178, 223 (1984)).  This is "the baseline for the admissibility of expert testimony."  Ibid.

Here, the first prong of N.J.R.E. 702 is satisfied because there is no dispute that the impact of opiates on vision is beyond the ken of the average juror.  The third prong of N.J.R.E. 702 was addressed by the trial court's finding that Dr. Guzzardi had sufficient expertise to opine that plaintiff was under the influence at the time of the accident.  But the trial court did not address the second prong of N.J.R.E. 702—whether Dr. Guzzardi's opinion was based on a reliably sound methodology—and instead focused on whether his testimony amounted to an impermissible net opinion.

On appeal, plaintiff does not dispute that heroin use causes pinpoint pupils but rather he challenges the definition of pinpoint pupils, whether his presentation fit this definition, whether the presence of pinpoint pupils was an accurate estimator that he remained under the influence of heroin, and whether his pinpoint pupils impacted his vision.  Our review of the record reveals the trial court did not consider these arguments, all of which challenge the reliability of Dr. Guzzardi's opinion.

We have an overarching concern that the trial court's analysis failed to sufficiently adhere to the <u>Daubert</u> standard and the principles set forth by our Supreme Court more recently in <u>Accutane</u> and <u>Olenowski</u>. Put succinctly, Dr. Guzzardi opined that because plaintiff had admitted to using heroin earlier in the day, and because he presented with pinpoint pupils at the time of the accident, he was still under the influence of heroin at the time of the accident.

Dr. Guzzardi did not claim that plaintiff's heroin use impaired his judgment or reaction time; he conceded that he could not make those determinations because he did not know how much heroin was in plaintiff's system. Nonetheless, Dr. Guzzardi opined that plaintiff's pinpoint pupils impaired his peripheral vision and ability to see at night. This conclusion is salient because the only adverse effect of plaintiff's heroin use according to Dr. Guzzardi, was its impact on plaintiff's vision. The trial court never determined that Dr. Guzzardi was qualified to testify about vision under N.J.R.E. 702.

Moreover, there is no real dispute that heroin can cause pinpoint pupils, and that Dr. Guzzardi, having expertise in toxicology, can opine as to that fact. But, Dr. Guzzardi's opinion went beyond this point, opining about how pinpoint pupils, in turn, impact one's peripheral vision and ability to see at night. While our Supreme Court has taken a liberal approach when assessing an individual's

20

qualifications to testify on a topic as an expert witness, State v. Jenewicz, 193 N.J. 440, 454 (2008), the trial court did not address whether Dr. Guzzardi's expertise—as a toxicologist and emergency room physician—extended to how opioids impact one's vision, despite his lack of qualifications as an ophthalmologist. In this respect, Dr. Guzzardi's lack of expertise in the area of ophthalmology may constitute a flawed analysis, and the trial court failed to properly assess Dr. Guzzardi's qualifications to testify on this point. We add that Dr. Guzzardi's testimony to the jury that plaintiff's heroin use adversely impacted his vision, without being able to quantify to what extent it impacted plaintiff's vision, may constitute speculation and a net opinion.

The net opinion rule "is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). It "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan, 127 N.J. at 417). An expert's conclusion may be excluded "if it is based merely on unfounded speculation and unquantified possibilities." Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super.

563, 580 (App. Div. 1997)). Such an opinion is excluded because "when an expert speculates, 'he [or she] ceases to be an aid to the trier of fact and becomes nothing more than additional juror." Ibid. (quoting Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), overruled on other grounds, Jerista v. Murray, 185 N.J. 175 (2005)). The net opinion rule also "focuses upon 'the failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom.'" Kaplan v. Skoloff & Wolfe, P.C., 339 N.J. Super. 97, 102 (App. Div. 2001) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)).

Plaintiff also maintains that Dr. Guzzardi's opinion should have been excluded because he could not conclusively determine whether plaintiff's heroin use was a significant contributing factor for the accident. In Gustavson v. Gaynor, 206 N.J. Super. 540, 545-46 (App. Div. 1985), we addressed admissibility of intoxication evidence and its potential for prejudice in a personal injury action where a party purportedly drank alcohol prior to his car accident. We held that a party's consumption of alcohol could not be admitted unless there was "supporting evidence" that the driver was unfit to drive due to his or her intoxication at the time of the accident. Id. at 545. Such evidence may include proof of excessive drinking or erratic driving. Ibid. Similarly, our

22

Supreme Court recently commented that where a driver's ingestion of drugs is alleged to have caused the driver's impairment, the impairment "must be proven by the State with independent evidence." State v. Olenowski, 255 N.J. 529, 609 (2023) (Olenowski II) (citing State v. Bealor, 187 N.J. 574, 577 (2006)). Such independent evidence may include factual observations of intoxication by the arresting officer, a driver's admission, or drug paraphernalia found in the car. Id. at 610. Plaintiff also questions whether there is medical support for Dr. Guzzardi's opinion that pinpoint pupils mean one is still under the influence of heroin and whether the probative value of the heroin evidence is outweighed by the potential for undue prejudice.[9]

---

[9] As discussed in Olenowski II, 255 N.J. at 549, under the influence means "a substantial deterioration or diminution of the mental faculties or physical capabilities of a person whether it be due to intoxicating liquor, narcotic, hallucinogenic or habit-producing drugs." (quoting State v. Tamburro, 68 N.J. 414, 420-21 (1975)). Yet in terms of criminal liability, unlike with alcohol consumption, there is no designated blood level that constitutes a "per se violation" of driving under the influence of drugs. Id. at 545, 548. Consequently, while a toxicology report can corroborate the presence of drugs in the driver's system, it "cannot prove that the driver was actually impaired by drugs while behind the wheel," and it is unclear what "drug level . . . establishes impairment per se." Id. at 608. While this language refers to criminal culpability, it also relates to the lack of clarity as to what constitutes drug-impaired driving.

Although we do not resolve these questions here, we are persuaded the best course is to remand this matter to the trial court for a more fulsome analysis of the <u>Dauber</u> factors. We accordingly remand this matter to the trial court to conduct a <u>Daubert</u> hearing and to provide a more detailed and complete factor-by-factor <u>Daubert</u> analysis.

For the benefit of the trial court, the parties shall provide the trial court, within twenty days of this opinion, their appellate briefs, and appendices. The trial court has the discretion to require supplemental briefing. If the trial court determines that Dr. Guzzardi offered a proper expert opinion, and that the heroin evidence was not unduly prejudicial, the verdict should stand, otherwise, a new trial will be necessary. The remand shall be concluded by April 26, 2024. We intimate no views on the appropriate outcome.

## III.

Next, plaintiff argues the trial court erred in following the Model Jury Charge on settling defendants. Plaintiff contends the trial court should have rejected use of the Model Jury Charge, as the trial court did in the case of <u>Hernandez v. Chekenian</u>, 447 N.J. Super. 355 (Law Div. 2016), because the settlement was irrelevant to the jury's deliberations. We disagree.

Appropriate and proper jury instructions are essential for a fair trial. Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015). "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Ibid. (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). Thus, "[j]ury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them[.]'" Ibid. (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)).

Instructions given in accordance with the Model Jury Charges, or which closely track the Model Jury Charges, are generally not considered erroneous. Mogull v. CB Com. Real Estate Grp., Inc., 162 N.J. 449, 466 (2000). "As a general matter, [appellate courts] will not reverse if an erroneous jury instruction was 'incapable of producing an unjust result or prejudicing substantial rights.'" Prioleau, 223 N.J. at 257 (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013)).

At trial, plaintiff moved to exclude any mention of the DOT settlement to the jury, arguing it was irrelevant and would result in undue speculation by the jury as to the amount of the settlement, and thus adversely influence any award

to him. The trial court disagreed, stating the jury would learn of DOT's role in the accident during trial, and during deliberations would consider whether DOT was negligent and a proximate cause of the accident, making it "the elephant in the room with the jury free to speculate in any direction to the unfair detriment to either party because . . . DOT was not a participant at trial."

At the start of trial and following counsels' summations, the trial court instructed the jury that DOT was a named defendant in this case, but "[b]efore the trial started, . . . plaintiff and . . . DOT . . . resolved their differences." The trial court directed the jury "not to speculate as to the reasons why . . . plaintiff and . . . DOT settled this dispute," or what amount, if any, was paid to resolve the claim. The trial court then instructed the jury to consider whether the Township was negligent, and if it was, whether its negligence was a proximate cause of the accident. Next, the trial court instructed the jury to consider whether DOT was negligent, and if so, whether its negligence was a proximate cause of the accident.

On appeal, plaintiff reprises the argument he made before the trial court that it should have followed the holding in Hernandez, 447 N.J. Super. at 358-59, and departed from the Model Jury Charge because the charge contains irrelevant information regarding a settlement and highlighting the settlement

invited speculation. Plaintiff further argues that since the jury had to consider DOT's level of culpability anyway, the settlement terms were irrelevant, comparing the situation to cases where parties are barred from addressing a related worker's compensation claim in a third-party lawsuit based on the theory the jury may be influenced to give the plaintiff's claim less consideration if it thinks plaintiff has other avenues of redress. We are unpersuaded.

Pertinent here is the language contained in Model Jury Charges 1.11G and 1.17 on "Settling Defendants," given by the trial court at the beginning and end of the trial. The preliminary charge advises the jury that the plaintiff had raised a claim against another party, and before the trial started, the other party and plaintiff had settled and the other party "will no longer be involved in this trial." Model Jury Charges (Civil), 1.11G, "Settling Defendants" (rev. Apr. 2018).

The Model Jury Charge given before deliberations is more detailed, notifies the jury that there was another defendant in the case; that plaintiff and the other defendant reached a settlement; and instructs the jury not to speculate as to the reasons for the settlement or the amount, if any, of the settlement. Model Jury Charges (Civil), 1.17, "Instructions to Jury in Cases in Which One or More Defendants Have Settled with the Plaintiff" (rev. Apr. 2018). The charge continues that the jury must first determine if the remaining defendant

27

was negligent and the proximate cause of the accident, and then if the settling defendant also was negligent and a proximate cause of the accident. Ibid.

However, the Model Jury Charges include a "Note to Judge," which reads as follows:

> In Hernandez v. Chekenian, 447 N.J. Super. 355 (Law Div. 2016), Judge Rea held that Model Civil Jury Charges 1.11G and 1.17 should only be used in cases where the defendant settles during trial. It should not be given when defendants settle before the trial begins because it is irrelevant and unduly prejudicial. In dicta, he questioned the use of the terms "settlement" and "settled" as being irrelevant as well as prejudicial. This case, while published, has not been the subject of appellate review. The Supreme Court Committee for Model Civil Jury Charges is providing this for informational purposes for the trial judge.
>
> [Model Jury Charges (Civil), 1.11G; Model Jury Charges (Civil), 1.17.]

Plaintiff relies on the holding in Hernandez, 447 N.J. Super. at 357, where the trial court held that the settling defendant jury charge should not be given if the party in question settled the case before trial began. The case involved a three-car accident, where one of the defendants settled with the plaintiff through his insurance carrier. Id. at 356. There, the trial court declined to read the settling defendants jury charge, finding that there was "no legitimate reason that

28

a jury needs to be told that there was another defendant(s) who settled their dispute(s) by paying an amount of money." Id. at 357.

The trial court in Hernandez questioned the language of the Model Jury Charge, stating that it raised an issue that was not relevant to the deliberations process, and then immediately told the jury to disregard it. Id. at 358. The trial court there noted that the settling defendant charge was combined with the language about comparative negligence, where a settling party appears on the verdict sheet to determine the percentage of negligent conduct attributable to that party. Id. at 358-59. The trial court added that this does not mean, however, that the jury should also be told that the settling party paid money to the plaintiff. Id. at 359. We note the trial court's decision in Hernandez did not result in any substantive changes to Model Jury Charges (Civil) 1.116 and 1.17. The "Note to Judge" specifies the Hernandez decision is provided for informational purposes for the trial judge and has not been the subject of appellate review.

Here, the trial court's jury instructions correctly adhered to the Model Jury Charges. "[A] jury charge is presumed to be proper when it tracks the [M]odel [J]ury [C]harge because the process to adopt [M]odel [J]ury [C]harges is 'comprehensive and thorough.'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)). See also Mogull,

162 N.J. at 44 ("It is difficult to find that a charge that follows the Model Jury Charge so closely constitutes plain error."). However, the Model Jury Charges "are not binding authority," State v. Bryant, 419 N.J. Super. 15, 28 (App. Div. 2011), and may be reviewed on appeal. Morlino v. Med. Ctr., 152 N.J. 563, 590 (1998) (although the Court concluded that the disputed Model Jury Charge did not have the capacity to mislead the jury, it nevertheless remanded the charge to the Supreme Court Committee on Model Jury Charges, Civil, to reconsider and rework the charge in consideration of the Court's findings).

The jury in this case was advised in a straightforward manner that plaintiff and DOT "resolved their differences" prior to trial, and the jury was not to speculate about what the resolution was. Moreover, it has long been the practice in New Jersey that,

> where multiple tort-feasors are or may be jointly responsible for an individual's injuries and losses, and one or more of them effect a settlement in exchange for a covenant not to sue, the fact of the settlement, but not the amount paid, is generally brought to the attention of the jury at the trial.
>
> [Theobold v. Angelos, 40 N.J. 295, 303-04, 191 A.2d 465 (1963).]

Essentially, jurors have to be told the facts of a settlement in order to avoid juror speculation. Theobold, 40 N.J. at 304. The danger of this speculation arises

whenever a jury is asked to make a liability determination regarding an absent party, regardless of whether that party appeared for any portion of the trial.

Finally, a reviewing court is concerned with the "overall effect" of a jury charge rather than allegedly erroneous words "in isolation." State v. Savage, 172 N.J. 374, 387 (2002). In this case, the trial court was not bound to follow the dicta in Hernandez, and it clearly was appropriate to use the Model Jury Charges as given, which complied with well-established precedent, and in these circumstances, did not create prejudice.

Affirmed in part, and remanded in part for a Daubert hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3196-21