SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Players Place II Condominium Association, Inc. v. K.P. (A-60/61-22) (088139)**

**Argued November 6, 2023 -- Decided March 13, 2024**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the trial court properly dismissed the disability discrimination claims brought by condominium unit owners after the condominium association declined their request to have an emotional support animal (ESA) based on the animal's weight. The Court also addresses how requests of this type should be evaluated under New Jersey's Law Against Discrimination (LAD).

Plaintiff Players Place II Condominium Association limits pets "to the small domestic variety weighing thirty (30) pounds or less at maturity." Defendant K.P. agreed to be bound by the policy when he purchased a unit. His spouse, defendant B.F., has been diagnosed with several mental health conditions, and K.P. notified the Association that he and B.F. were "considering adopting an emotional support dog" that would "[m]ost likely . . . be over the 30lb pet limit." Before the Association responded, B.F. adopted a 63-pound dog named Luna to live with her as an ESA. After some further exchanges, counsel for the Association wrote that, "should a dog weighing more than 30lbs . . . even enter the Association, the Association will immediately commence an action at law." K.P. responded that assistance animals are not considered pets and that, if the Association denied his claim, his "next step [would] be to file a complaint . . . for disability discrimination."

The Association filed a complaint asserting K.P. had violated the Association's rules because he had a dog that weighed more than 30 pounds and had failed to register the animal. K.P.'s answer included a counterclaim against the Association for allegedly violating anti-discrimination laws.

The chancery court conducted a bench trial and heard testimony from an officer of the Association, multiple medical experts, defendants, and family members. It dismissed defendants' claims under the LAD and federal law, finding that B.F. was not "handicapped or disabled" within the meaning of the relevant statutes. The court allowed Luna to remain with B.F. on narrow equitable grounds, however, because "this particular dog . . . offers her comfort and seems to assist her in lessening her episodes," and "ha[d] not been at all disruptive."

1

A divided Appellate Division panel modified and affirmed the trial court's judgment. The majority found that "the judge acted within her discretion in fashioning an equitable remedy suitable for the particular facts of the case." The majority determined that the trial court misinterpreted the relevant statutes when it found B.F. was not disabled, but it affirmed the dismissal of the discrimination claims, finding "insufficient proof that having a dog that exceeded the weight limit in the Association's pet policy 'was necessary to afford [B.F.] an equal opportunity to use and enjoy' the condominium unit." The dissent agreed that defendants' claims were properly dismissed but disagreed with the award of equitable relief.

Plaintiff appealed as of right based on the dissent, R. 2:2-1(a)(2), and the Court granted defendants' petition for certification, 254 N.J. 500 (2023).

**HELD:** Requests for reasonable accommodations like the one here should be assessed under the following framework: Individuals who seek an accommodation must show that they have a disability under the LAD and demonstrate that the requested accommodation may be necessary to afford them an "equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-3.4(f)(2). Housing providers then have the burden to prove the requested accommodation is unreasonable. During that process, both sides should engage in a good-faith, interactive dialogue. In the end, if the parties cannot resolve the request, courts may be called on to balance the need for, and benefits of, the requested accommodation against the cost and administrative burdens it presents. Here, the claims should not have been dismissed.

1. The LAD prohibits discrimination in housing on account of a person's disability, N.J.S.A. 10:5-12(g)(2), including "any mental, psychological, or developmental disability," id. at -5(q). It defines "disability" more broadly than federal law, which requires that a disability "substantially limits one or more . . . major life activities." 42 U.S.C. § 3602(h). The LAD includes no such requirement. (pp. 18-22)

2. After reviewing relevant case law and guidance by state and federal agencies, the Court explains that a resident of a condominium complex is entitled to request an accommodation to a pet policy in order to keep an emotional support animal. The individual must first demonstrate they have a disability under the LAD. In addition, they must show that the requested accommodation may be necessary to afford them an "equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-3.4(f)(2). The housing provider then has the burden to prove the requested accommodation is unreasonable. As part of that process, the parties should engage in a good-faith, interactive dialogue to exchange information, consider alternative options, and attempt to resolve or narrow any issues. If that collaborative effort fails and litigation follows, courts will inevitably need to balance the need for, and benefits of, the requested accommodation against the costs and administrative burdens it presents to determine whether the accommodation is reasonable. (pp. 22-27)

2

3.  Here, there is no longer any dispute that B.F. is disabled within the meaning of the LAD.  Whereas the trial court focused on the first of two ways to establish a mental, psychological, or developmental disability under N.J.S.A. 10:5-5(q) -- a disability "which prevents the typical exercise of any bodily or mental functions" -- the Appellate Division properly looked to the statute's second ground -- a disability that "is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  And the record amply supports the Appellate Division's conclusion that B.F. satisfied the second ground.  In addition to establishing their disability, residents have the initial burden to demonstrate the accommodation they seek is necessary.  The question is whether the accommodation will alleviate at least one symptom of the disability, not whether the accommodation will cure or eliminate the disability.  Here as well, trial testimony provided a record for the chancery court.  The LAD does not require that an ESA be prescribed by a mental health professional or that B.F. establish a specific need for a dog that exceeded the weight limit.  The Court notes that, when possible, it is preferable to engage in a collaborative conversation in advance of acquiring an ESA.  (pp. 27-32)

4.  The burden then shifts to the housing provider to prove the requested accommodation was unreasonable -- a fact-specific weighing of the relevant costs and benefits.  The proper inquiry considers whether allowing an ESA would fundamentally alter the housing provider's operations or impose an undue financial or administrative burden.  Whether the animal has been trained is not a relevant consideration.  Before a housing provider denies a request on reasonableness grounds, the parties should engage in good-faith, interactive discussions to evaluate the accommodation and explore possible alternatives.  (pp. 33-34)

5.  The chancery court dismissed defendants' discrimination claims and granted relief on equitable grounds under its review of the Association's breach of contract claim.  But in a dispute like this, the proper starting point is defendants' discrimination claim.  In light of the record in this case, the chancery court and Appellate Division should not have dismissed B.F. and K.P.'s discrimination claim. B.F. presented evidence of her need for an accommodation, which the Association disputes.  Whether the Association has shown the accommodation sought is unreasonable is also disputed.  Both inquiries are fact-sensitive and were not addressed at the bench trial.  The Court therefore remands the matter and provides guidance for the remand proceedings.  (pp. 34-37)

**REVERSED.  The dismissal of defendants' counterclaim is VACATED, and the matter is remanded to the LAW DIVISION.**

**JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in CHIEF JUSTICE RABNER's opinion.  JUSTICE WAINER APTER did not participate.**

3

SUPREME COURT OF NEW JERSEY
A-60/61 September Term 2022
088139

Players Place II Condominium
Association, Inc.,

Plaintiff-Appellant/
Cross-Respondent,

v.

K.P. and B.F.,

Defendants-Respondents/
Cross-Appellants.

On appeal from and certification to the Superior
Court, Appellate Division.

| Argued | Decided |
|---|---|
| November 6, 2023 | March 13, 2024 |

David J. Byrne argued the cause for appellant/cross-respondent (Ansell Grimm & Aaron, attorneys; David J. Byrne and Nicole D. Miller, on the briefs).

Talbot B. Kramer, Jr. argued the cause for respondents/cross-appellants (Freidel & Kramer, attorneys; Talbot B. Kramer, Jr. and Donna L. Freidel, on the briefs).

David Leit, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; David Leit, of counsel, and Liza B. Fleming and Douglas R. Praschak, Deputy Attorneys General, on the brief).

1

Deborah L. Mains argued the cause for amicus curiae New Jersey Association for Justice (Costello & Mains, attorneys; Deborah L. Mains and Miriam S. Edelstein, of counsel and on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this case, an individual with a disability sought to have an emotional support animal live in her unit at a condominium complex. The condominium association declined the request because it does not allow residents to have pets that weigh more than thirty pounds.

Emotional support animals (ESAs), however, are different from pets and are not subject to general pet policies. ESAs can help people who struggle with mental health issues and other disabilities, and can enable them to function better in their everyday lives.

We now consider for the first time how to evaluate requests of this type under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to 10:5-50. We hold that requests for reasonable accommodations like the one here should be assessed under the following framework: Individuals who seek an accommodation must show that they have a disability under the LAD and demonstrate that the requested accommodation may be necessary to afford them an "equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-

2

3.4(f)(2). Housing providers then have the burden to prove the requested accommodation is unreasonable.

During that process, both sides should engage in a good-faith, interactive dialogue. In the end, if the parties cannot resolve the request, courts may be called on to balance the need for, and benefits of, the requested accommodation against the cost and administrative burdens it presents. Judges will then be able to determine whether the accommodation is reasonable under the LAD.

For reasons that follow, we find that the discrimination claims the unit owners brought should not have been dismissed. We therefore reverse the judgment of the Appellate Division, vacate the dismissal of defendants' counterclaim under the LAD and federal Fair Housing Act (FHA), 42 U.S.C. §§ 3601 to 3619, and remand to the trial court for further proceedings.

I.

A.

Players Place II is a condominium community in Gloucester Township. Defendant K.P. bought a unit there in May 2018.[1]

---

[1] Because this opinion discusses confidential medical issues about K.P.'s spouse, defendant B.F., we use initials to protect her privacy.

Plaintiff Players Place II Condominium Association operates the condominium property. The Association's rules and regulations include a pet policy that limits pets "to the small domestic variety weighing thirty (30) pounds or less at maturity." Unit owners who acquire or replace a pet after buying a unit are required to "contact the Association within two (2) weeks to request and complete a Pet Registration Form." No pet that "causes a nuisance of any kind to another unit owner" "may be kept." The policy exempts "[d]ogs used for the blind" from the weight restriction but does not mention emotional support animals.

K.P. agreed to be bound by the policy when he purchased a condominium unit. In late July or early August 2018, K.P.'s girlfriend and now spouse, B.F., moved into the unit. As discussed below, she has been diagnosed with several mental health conditions.

K.P. notified the Association by email on August 2, 2018 that he and B.F. were "considering adopting an emotional support dog" that would "[m]ost likely . . . be over the 30lb pet limit." K.P. asked what medical documentation would be needed. On August 5, 2018, B.F. adopted a dog named Luna from a shelter to live with her as an ESA. At maturity, Luna would weigh more than 30 pounds; according to the record, she weighed 63 pounds in January 2019.

4

The Association responded on August 7, 2018, without knowing that B.F. had already adopted Luna. In an email, the Association stated that it "will not and cannot accommodate any alleged disability in regards to a dog that weighs in excess of 30 lbs. that has not yet been purchased or possessed."

The following day, K.P. sent a second email and clarified that B.F. "is moving in with me and she already has an emotional support dog." K.P. attached a letter from B.F.'s psychiatric nurse practitioner, Natalie C. Eisenhower, which stated that she had been treating B.F. since February 2018. Eisenhower noted that B.F. "suffers from a mood and anxiety disorder" and "would benefit" from having an ESA.

Counsel for the Association responded on August 13, 2018. In a letter to K.P., counsel stated, "should a dog weighing more than 30lbs . . . even enter the Association, the Association will immediately commence an action at law seeking a court order barring any dog weighing more than 30lbs." Although the Association offered its alternative dispute resolution program (ADR) to address the issue, it added that, even if the parties proceeded to ADR, the Association "will still commence legal action . . . should a dog weighing more than 30lbs . . . enter the Association."

Two days later, K.P. emailed the attorney and noted that, according to the United States Department of Housing and Urban Development (HUD),

5

"assistance animals are not considered pets."  K.P. wrote that if the Association denied his claim, his "next step [would] be to file a complaint with HUD for disability discrimination."

In late September or early October 2018, the Association's board president saw B.F. walking Luna on the condominium grounds.  At no point did anyone file a noise complaint or claim that Luna caused any property damage.

B.

The Association filed a complaint against K.P. on October 3, 2018.  It asserted K.P.'s conduct violated the Association's master deed, bylaws, and rules and regulations because he had a dog that weighed more than 30 pounds and had failed to register the animal.  K.P.'s answer included a counterclaim against the Association.  He, along with B.F. as a counterclaimant, alleged the Association violated state and federal anti-discrimination laws.  In amended pleadings that followed, the Association added B.F. as a defendant, and defendants asserted the Association had violated the LAD and the FHA.  Defendants claimed that Luna was a support animal, "as recognized by the" New Jersey Division on Civil Rights, not a pet, and that "proof of the [dog's] medical necessity" had been provided to the Association.

6

On May 29, 2019, the chancery court entered an order to bifurcate the proceedings. The order directed that the Association's claims "regarding allowing the dog to remain in the condominium [would] remain in Chancery." After that trial was completed, "[t]he damages portion of the case [would be] transferred to the Law Division." The court also granted K.P. and B.F. "leave to amend their counterclaim to request a trial by jury." They requested a jury trial for the LAD and FHA claims in a second amended counterclaim.

The chancery judge conducted a bench trial in September and October 2020 and heard testimony from an officer of the Association, multiple medical experts, defendants, and family members.

John Quinesso, president of the Association's board, testified that the pet policy had been in place since 2006 and that its weight restriction was designed to prevent damage to landscaping and avoid noise complaints. Quinesso explained the policy does not mention ESAs, and the community treats "any domesticated animal living with a person" as "a pet." Since the policy went into effect, the Association granted two requests for ESAs.

Kathryn Rim, a licensed clinical social worker, testified by way of a video-recorded deposition. Rim began treating B.F. in 2016 based on a recommendation from B.F.'s psychiatrist. Two to three years earlier, B.F. had been diagnosed with bipolar II disorder. Based on Rim's observations, she

7

added panic disorder and acute post-traumatic stress disorder to the diagnosis. She also noted that B.F. had "ADD or ADHD."

When the two first met, B.F. had been in a car accident that "triggered . . . a depressive episode" during which she "experienc[ed] suicidal thoughts." In 2017 and 2018, she went through "a few depressive episodes" marked by periods of stability in between -- "typical of [a] bipolar" disorder, which is "marked by up-and-down cycles." The episodes ranged from two weeks to one month. Throughout that time, B.F. took medication that mitigated but did "not fix" her symptoms.

Rim has never prescribed an ESA or known a doctor to do so. She explained it is more common for patients to get an ESA on their own. Rim added that ESAs can have "a huge benefit" for people diagnosed with mental health disorders because the animals can decrease symptoms and improve the owner's "quality of life" and "ability to function day to day."

After getting Luna, B.F. told Rim the dog "was helping with . . . her emotional state." Rim explained that B.F.'s depressive episodes were shorter and "more mild to moderate" than before. Rim also noticed an improvement in her "ability to cope with stressors." For example, B.F. used to hide in a closet to cope when she became depressed; with Luna, B.F. spent "less[] time" in "the closet, if at all."

8

Rim explained that the bond between the patient and the animal was "extremely important . . . for there to be emotional support." B.F. grew up with a larger dog that provided her with emotional support and described an "immediate bond and connection" with Luna "when she met her."

Rim observed that B.F.'s "prognosis is good in the sense that her condition can continue to be managed." But "if her dog were to be taken away at this point . . . , that would be very detrimental to her mental health." Rim added that B.F.'s "ability to cope with change is really, really challenging, . . . and given [her] history of suicidality, depressive episodes, and . . . diagnosis of bipolar, [removing the ESA] could trigger all of those things."

Dr. Jo-Ann M. Cannon, Ph.D., a licensed clinical psychologist, also testified by way of a video-recorded deposition. Cannon met with B.F. and examined her medical records. Cannon testified that B.F. "has a long history of mental illness" dating "back to the seventh grade." She experienced severe anxiety and depression at a young age and was placed on medication then. According to Cannon, B.F.'s diagnoses include bipolar disorder, post-traumatic stress disorder, and attention deficit disorder, for which she takes various medications including two mood stabilizers, "an anti-depressant," an "anti-psychotic," and "Adderall for her ADD."

Like Rim, Cannon explained that B.F. "doesn't respond well to change" and "decompensates" when there is stress. Even while on medication, her medical issues affect her ability to function. On a bad day, Cannon noted, B.F. will "lock herself in a closet and . . . stay there for hours in order to calm herself down in a calm environment."

Cannon testified that B.F. "could not be alone in the condo" "[b]efore getting Luna." Although B.F. still suffers from depression and anxiety, she is now "comfortable staying alone in the condo as long as she has Luna with her." When B.F. is "panicking or decompressing," "the dog will sit in the closet with her for hours" and "lick[] her face when she cries." In Cannon's opinion, Luna "keeps [B.F.] stable."

Cannon explained that the impetus for getting an ESA "always come[s] from the patient," not the clinician. She had not heard of clinicians prescribing ESAs but has written letters of support for ESAs when an animal "alleviate[s] some of the symptoms" the disabled person is "experiencing."

Cannon opined that Luna helps B.F. enjoy her daily life in the condominium unit. If Luna were no longer allowed to live with B.F., Cannon testified that she thought B.F. would decompensate, "which could be potentially dangerous because . . . she has suicidal ideation on and off." Without Luna, Cannon believed B.F's "condition would deteriorate."

10

Natalie Eisenhower, the psychiatric nurse practitioner who treated B.F., also testified. Eisenhower monitored and helped manage B.F.'s medications. Eisenhower did not prescribe or recommend that B.F. get an ESA but wrote two letters of support at B.F.'s request. Eisenhower testified that she thought an ESA "would benefit" B.F. because the animal helped lessen her symptoms and "help[ed] her cope when she does have . . . episodes."

The Association called Dr. Mark Siegert, a clinical and forensic psychologist, as an expert witness. Siegert reviewed B.F.'s available medical records, evaluated her in person, and administered two psychological tests. He concluded that B.F. "actually suffer[s] from some mental illness." His "diagnostic impression" of B.F. was that she had "bipolar II disorder, major depressive disorder, generalized anxiety disorder, somatoform disorder, compulsive personality disorder, and borderline personality type."

Siegert, however, did not find "any substantial limitation . . . of any major life activities or bodily functions" because of B.F.'s mental illness. Although he noted that depression and panic attacks "restrain[]" B.F. "at the moment," Siegert found that she is "able to get back together" and has "done . . . quite well through most of her life." In his opinion, her restrictions were not substantial.

11

Siegert noted that B.F.'s treating psychiatrist had not prescribed or recommended an ESA for B.F., "[w]hich is consistent with what [he] believe[d]." He concluded that Luna had not "directly ameliorated" any of B.F.'s symptoms. In his opinion, B.F. "did not require a dog to have equal use and enjoyment of the [condominium] unit."

B.F., K.P., and B.F.'s parents testified as well. B.F. explained that she has struggled with mental health issues since middle school. She identified her diagnoses, medications, treatment providers, and ongoing symptoms.

B.F. noted that she raised the idea of an emotional support animal with her therapist. She had a larger dog while growing up, which she always found "comforting." Smaller dogs did not provide her "with that same level of . . . relaxation." Because they were "loud and yappy," they gave her "more anxiety" instead. She said that she bonded with Luna -- a larger, quiet dog -- right away.

B.F. testified that Luna provides "a really great deal of comfort to" her. By way of examples, B.F. explained that Luna lies with her in the closet when she is "going through . . . an episode" and "lick[s] away [her] tears." B.F. added that her symptoms have "dramatically . . . decreased . . . in length" and frequency since she has had Luna.

K.P. confirmed that Luna has had a positive impact on B.F.'s behavior. Her parents corroborated B.F.'s account of her mental health issues and likewise commented on the positive effect Luna has had on B.F.

C.

The chancery court issued its ruling in early December 2020. It dismissed defendants' claims under the LAD and FHA but allowed Luna to remain with B.F. on narrow equitable grounds.

The court found that although B.F. "does suffer from various forms of mental disturbances," she is not "handicapped or disabled" within the meaning of the LAD and FHA. In support of that finding, the court noted that B.F. had graduated with honors and received positive reviews from her employer; "[n]o aspect of her diagnosed conditions . . . prevented her from the normal exercise of any bodily or mental functions." The court also observed that no one had prescribed an ESA for B.F. For those reasons, the court dismissed the LAD and FHA claims and did not award any damages to defendants.

The chancery court made additional findings that supported its equitable remedy. Even though it found "there was no proof at all that [B.F.] need[ed] a dog to alleviate her conditions," the court "believe[d]" that B.F. "ha[d] demonstrated that this dog has acted to relieve certain symptoms of her mental health conditions either by shortening or lessening them." The court noted that

Luna "allowed [B.F.] to remain in the . . . unit without [K.P.], which she couldn't do before she had the dog," and "help[ed] her to lessen or shorten the extent of the episode[s]." The court emphasized that because "this particular dog, not any other dog, just this dog . . . offers her comfort and seems to assist her in lessening her episodes," and because the dog "ha[d] not been at all disruptive," B.F. could "keep this dog."

Finally, the court vacated its prior order to transfer the damage claims to the Law Division. Because it found no violation of the LAD or FHA, the court explained there was "no damage portion left to be determined by a jury." In a written order, the court directed each party to pay its own counsel fees.

Plaintiff appealed and argued the trial court erred in failing to enforce the Association's rules and regulations and allowing Luna to stay. Defendants cross-appealed. They challenged the chancery court's finding that B.F. was not disabled and therefore not entitled to an accommodation, damages, or attorneys' fees under the LAD and FHA.

A divided Appellate Division panel modified and affirmed the trial court's judgment. The majority found that "the judge acted within her discretion in fashioning an equitable remedy suitable for the particular facts of the case." The appellate majority concluded the decision "was supported by B.F.'s unrebutted attachment to Luna and the emotional support she receives

14

from Luna"; "[o]n the other side of the scale, the Association presented no evidence that Luna caused any problems."

The majority, however, noted that the trial court misinterpreted the statute when it found B.F. was not disabled. To establish a disability under the LAD, the majority explained, it is not necessary to demonstrate that a mental disability "prevents the typical exercise of any bodily or mental functions"; the statute provides an alternative way to establish a disability "by accepted clinical or laboratory diagnostic techniques." (citing N.J.S.A. 10:5-5(q)). Under that standard, the majority concluded that "the unrefuted medical evidence established that B.F. was disabled" under the LAD.

The majority found both "that B.F. suffer[ed] from various psychological disorders, and [that] B.F.'s mental health professionals testified that Luna ameliorated certain symptoms of B.F.'s disability." But the majority could not "say that the [chancery] judge erred when she found there was insufficient proof that having a dog that exceeded the weight limit in the Association's pet policy 'was necessary to afford [B.F.] an equal opportunity to use and enjoy' the condominium unit." (quoting Oras v. Hous. Auth. of Bayonne, 373 N.J. Super. 302, 312 (App. Div. 2004)). Critical to its analysis, the majority observed that no medical or mental health professional recommended or prescribed an ESA. The majority also observed there was no medical evidence

15

that B.F. needed a dog larger than thirty pounds. As a result, the majority found "the Association was relieved of its obligation to provide the requested accommodation." (citing Oras, 373 N.J. Super. at 317).

The dissent agreed that defendants' claims under the LAD and FHA should be dismissed. "With that finding," it explained, "there was nothing left for the trial judge to do." The dissent therefore found the trial court abused its discretion in "awarding defendants a remedy when [there was] no wrong to right."

Plaintiff appealed as of right based on the dissent, pursuant to Rule 2:2-1(a)(2). The Court granted defendants' petition for certification. 254 N.J. 500 (2023). The Court also granted leave to appear as friends of the court to the Attorney General and the New Jersey Association for Justice (NJAJ).

II.

B.F. and K.P. contend that the Appellate Division used an improper standard to determine when a disabled person is entitled to an emotional support animal. Defendants submit that because B.F. presented proof that she is disabled and that Luna ameliorated the symptoms of her disability, and because no complaints had been lodged against Luna, the court's inquiry should have ended there.

16

B.F. and K.P. also assert that the trial court properly exercised its equitable powers to fashion a remedy that allowed B.F. to keep Luna. If B.F. and K.P. prevail, they maintain the issue of damages should proceed in the Law Division before a jury.

The Association argues that its rules are valid and enforceable. Under the business judgment rule, the Association contends the rules should apply here. The Association also maintains that it did not violate the LAD. Because it did not commit any wrong against defendants, the Association argues, the trial court abused its discretion in permitting Luna to stay in the condominium unit. According to the Association, both law and equity require that Luna be removed.

The Association agrees with defendants that, if the Appellate Division's judgment is reversed, a jury trial will be needed to adjudicate defendants' LAD claims.

The Attorney General, on behalf of the Division on Civil Rights, argues "[t]his Court should hold that (1) B.F. has a disability under the LAD; (2) this particular accommodation was 'necessary,' even if this ESA was not prescribed by a doctor; and (3) housing providers must engage in a good-faith process with residents who request such an accommodation."

The Attorney General submits that the Appellate Division misapplied the standard to determine whether the requested accommodation was "necessary." Under the LAD, the Attorney General contends, "[a]n accommodation is necessary . . . if the individual with the disability can show the accommodation alleviates the effects of her disability to afford her the equal opportunity to use and enjoy her dwelling."

NJAJ argues that the Appellate Division misinterpreted the appropriate legal standard in light of the remedial purpose of the LAD and its implementing regulation, N.J.A.C. 13:13-3.4(f)(2). NJAJ also contends that it was clear error to find there was insufficient evidence to demonstrate the necessity of the requested accommodation.

III.

A.

B.F. and K.P. contend the Association has violated their rights under state and federal law. New Jersey's Law Against Discrimination is designed to eradicate discrimination in our society. Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115 (2010). The Legislature specifically directed that this remedial law "shall be liberally construed." N.J.S.A. 10:5-3.

Among other safeguards, the LAD prohibits discrimination in housing on account of a person's disability. N.J.S.A. 10:5-12(g)(2) states that

18

> [i]t shall be . . . an unlawful discrimination . . . [f]or any person, including but not limited to, any . . . managing agent of . . . any real property . . . [t]o discriminate against any person . . . because of . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any real property . . . or in the furnishing of facilities or services in connection therewith.

N.J.S.A. 10:5-12(h)(2) has a similar prohibition relating to real estate brokers and salespeople.

The LAD defines "disability" as a

> physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy and other seizure disorders, and which shall include . . . <u>any mental, psychological, or developmental disability</u>, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions <u>which</u> [1] prevents the typical exercise of any bodily or mental functions or [2] <u>is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques</u>.
>
> [N.J.S.A. 10:5-5(q) (emphases added).]

Various mental illnesses and psychological disorders are considered disabilities under the LAD. <u>See, e.g.</u>, <u>Domurat v. Ciba Specialty Chems. Corp.</u>, 353 N.J. Super. 74, 89 (App. Div. 2002) (attention deficit disorder, depression, "and other psychiatric disorders"); <u>Tynan v. Vicinage 13 of the Super. Ct.</u>, 351 N.J. Super. 385, 399 (App. Div. 2002) (post-traumatic stress disorder, depression, and anxiety panic attacks); <u>see also</u> <u>Clowes v. Terminix</u>

19

Int'l, Inc., 109 N.J. 575, 593-94 (1988) (alcoholism). When a disability "is not readily apparent" -- for example, when it is non-observable -- "expert medical evidence is required." Viscik v. Fowler Equip. Co., 173 N.J. 1, 16 (2002).

The Division on Civil Rights (Division) in the Department of Law and Public Safety is empowered "to prevent and eliminate discrimination" under the LAD. N.J.S.A. 10:5-6, -9.1. The Director of the Division is appointed by, and acts for, the Attorney General. Id. at -8(d).

Among other regulations the Division has promulgated, N.J.A.C. 13:13-3.4(f)(2) provides that

> [i]t is unlawful for any person to . . . [r]efuse to make reasonable accommodations in rules, policies, practices or services, or reasonable structural modifications, when such accommodations or modifications may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public and common areas.

The regulation applies to condominium associations. Est. of Nicolas v. Ocean Plaza Condo. Ass'n, Inc., 388 N.J. Super. 571, 575, 587-91 (App. Div. 2006).

Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Discriminatory housing practices include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary

20

to afford [a person who is handicapped] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); see also 24 C.F.R. § 966.7(a) (applying the same principle to lease and grievance procedures).

The LAD must be construed in a way that "permit[s] the Division on Civil Rights . . . to qualify as a 'certified agency' within the meaning of the Federal Fair Housing Amendments Act." N.J.S.A. 10:5-9.2. To qualify, HUD requires that the LAD provide rights, procedures, and remedies "that are substantially equivalent to those provided in the federal Fair Housing Act." 24 C.F.R. § 115.201(a).

The LAD, in turn, defines "disability" more broadly than the FHA does. Under the FHA, the correlative term "handicap"[2] means "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). That definition mirrors the language in the Americans with Disabilities Act (ADA). 42 U.S.C. § 12102(1) (defining "disability"). State law, by contrast, does not include any requirement that a disability "result in substantial limitation of a major life activity." Tynan, 351 N.J. Super. at 397. As a result, the LAD "has been

---

[2] In 2003, the New Jersey Legislature substituted the word "disability" for all references to "handicap" in the LAD. L. 2003, c. 180.

21

interpreted as significantly broader than" analogous federal law. Viscik, 173 N.J. at 16 (citing Failla v. City of Passaic, 146 F.3d 149, 154 (3d Cir. 1998)).

We look to federal law against discrimination, in general, as a helpful source of authority to interpret the LAD. Richter v. Oakland Bd. of Educ., 246 N.J. 507, 527 (2021).

B.

The Appellate Division's opinion in Oras outlines the proper framework to apply the above standards. In Oras, the court considered a claim that a disabled tenant brought under the FHA and the LAD. 373 N.J. Super. at 306, 310-11. The tenant argued that the Bayonne Housing Authority "discriminated against him by not providing . . . a handicap-accessible apartment, and by not permitting him to keep a dog that he claim[ed] assisted him with his daily activities." Id. at 306. The dog weighed more than the Authority's pet policy allowed. Id. at 307-08.

To assess the claims, the appellate court noted the disabled tenant had the initial burden to show the requested accommodation "was necessary to afford him . . . an equal opportunity to use and enjoy a dwelling." Id. at 312 (citing Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Scotch Plains, 284 F.3d 442, 457 (3d Cir. 2002)). The burden of proof then shifts to the housing

22

provider "to show that the requested accommodation is or was unreasonable." Ibid.

Notwithstanding its pet policy, the Oras court explained, the Authority was "obligated to accommodate" the tenant's "disability 'to the extent necessary to provide the handicapped person with an opportunity to use and occupy the dwelling unit equal to a non-handicapped person.'" Id. at 314 (quoting 24 C.F.R. § 966.7(a) and citing N.J.A.C. 13:13-3.4(f)(2)).

Both relevant issues -- "[w]hether a pet is of sufficient assistance to a tenant" and whether the accommodation sought is unreasonable -- involve fact-sensitive inquiries. Id. at 315. Housing providers are not required "to do everything humanly possible to accommodate a disabled person." Ibid. (quoting Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995)). The "cost" to the provider and "benefit" to the tenant both "merit consideration." Ibid. On one side, "[t]he requested accommodation must 'enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" Ibid. (quoting Bronk, 54 F.3d at 429); accord Anderson v. City of Blue Ash, 798 F.3d 338, 361 (6th Cir. 2015); Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1288-89 (11th Cir. 2014); Lapid-Laurel, 284 F.3d at 461. On the other side, courts may consider "the likely costs or administrative burdens to

be incurred by the" housing provider to accommodate an ESA.[3]  Oras, 373 N.J. Super. at 316 (citing Janush v. Charities Hous. Dev. Corp., 169 F. Supp. 2d 1133, 1136 (N.D. Cal. 2000)).

Federal courts have similarly found that a reasonable accommodation may include the use of an ESA, "despite the existence of a rule . . . prohibiting such an animal."  Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 110 (3d Cir. 2017); accord Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urb. Dev., 821 F.3d 92, 98 (1st Cir. 2016); Bhogaita, 765 F.3d at 1281, 1289.

C.

Both the Division and HUD have published guidance about emotional support animals.  The Division advised the public that "a housing provider may need to make an exception to a 'no pets' policy to permit a tenant with a disability to keep an emotional support animal (ESA)."  N.J. Div. on Civ. Rights, 5 Things You Should Know About Emotional Support Animals in Housing (DCR Guidance) (Oct. 6, 2022), https://www.njoag.gov/wp-content/uploads/2022/03/Fact_ESA.pdf.  A person with a disability "can

---

[3]  The above analysis does not apply to service animals, which are not subject to a balancing test.  See N.J.A.C. 13:13-3.4(c) ("It is unlawful for any person to fail or refuse to show, rent or lease any real property to a person because he or she is a person with a disability who is accompanied by a guide or service dog or animal.").  "Service dog[s]" are "trained to the requirements of a person with a disability including . . . minimal protection work, rescue work, pulling a wheelchair or retrieving dropped items."  N.J.S.A. 10:5-5(dd).

24

request a reasonable accommodation for [an] ESA." Ibid. If the "disability and disability-related need for an ESA are not obvious or otherwise known, [a] housing provider may request reliable documentation from [the person's] treating health care professional." Ibid. The housing provider, in turn, "must conduct an individualized assessment of [the] request and may deny [it] if allowing an ESA would create an undue burden on its operations." Ibid.

In 2020, HUD issued guidance in the form of best practices for housing providers to comply with the FHA as they assess "requests for reasonable accommodations to keep animals in housing." U.S. Dep't of Hous. & Urb. Dev., Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act at 1 (HUD Guidance) (Jan. 28, 2020), https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf. The HUD Guidance plainly states that "[a]ssistance animals are not pets." Id. at 3. The guidance extends beyond service animals to animals that "provide therapeutic emotional support for individuals with disabilities" and "alleviate[] at least one identified symptom or effect of a physical or mental impairment." Id. at 3, 19. Neither type of animal is subject to pet rules or policies. Id. at 14. "Thus, housing providers may not limit the breed or size of a dog used as a service animal or support animal just because of the size or breed . . . ." Ibid. But providers can refuse a request "if the specific animal

25

poses a direct threat" "to the health or safety of other[s]" "that cannot be eliminated or reduced to an acceptable level." Id. at 13.

According to HUD, "resident[s] may request a reasonable accommodation either before or after acquiring [an] assistance animal." Id. at 8. If the request lacks information about a person's disability or the need for an animal, HUD encourages housing providers "to engage in a good-faith dialogue with the requestor called the 'interactive process.'" Id. at 14. And if a request is denied because "it would impose a fundamental alteration to the nature of the provider's operations or . . . an undue financial and administrative burden, the housing provider should [similarly] engage in the interactive process to discuss" alternative ways to accommodate a person's "disability-related needs." Id. at 15.

The Division echoes HUD's guidance in its brief. The Division submits that "[h]ousing providers may not summarily reject a request." Instead, they should "engage in a good-faith discussion with a tenant or resident . . . like the 'interactive process' for accommodations in employment." (citing Victor v. State, 203 N.J. 383, 414-15 (2010) (discussing an employer's obligation to engage in an interactive process in the employment context); Richter, 246 N.J. at 543 (same)).

26

D.

In short, in a case like this, a resident of a condominium complex is entitled under state and federal law to request an accommodation to a pet policy in order to keep an emotional support animal. The individual must first demonstrate they have a disability under the LAD. In addition, they must show that the requested accommodation may be necessary to afford them an "equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-3.4(f)(2). The housing provider then has the burden to prove the requested accommodation is unreasonable.

As part of that process, the parties should engage in a good-faith, interactive dialogue to exchange information, consider alternative options, and attempt to resolve or narrow any issues. If that collaborative effort fails and litigation follows, courts will inevitably need to balance the need for, and benefits of, the requested accommodation against the costs and administrative burdens it presents to determine whether the accommodation is reasonable. See Oras, 373 N.J. Super. at 316-17.

IV.

We now return to the facts of this case and consider them under the appropriate legal framework. In light of the posture of this case, which we discuss later, we do so largely to offer guidance for the proper approach to

27

discrimination claims of this type. We rely on the record developed at the bench trial in the Chancery Division for the following discussion.

A.

The threshold question in an LAD case is whether the person seeking an accommodation has a disability under the statute. That issue is no longer in dispute. In a written submission to the Court after oral argument, the Association stated that "B.F.'s LAD disability is the law of the case." We therefore consider the point only briefly.

The chancery court found that B.F. did not have a disability because "no aspect of her diagnosed conditions . . . prevented her from the normal exercise of any bodily or mental functions." In so ruling, the court focused on the first of two ways to establish a mental, psychological, or developmental disability. See N.J.S.A. 10:5-5(q) (a disability "which prevents the typical exercise of any bodily or mental functions"). The Appellate Division properly looked to the statute's second ground: "any mental, psychological, or developmental disability . . . which . . . is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." Ibid.

The record amply supports the Appellate Division's conclusion that B.F. satisfied the second ground. Experts on both sides diagnosed B.F. with psychological disabilities. The Association's expert, Dr. Siegert, testified that

28

B.F. suffered from "bipolar II disorder, major depressive disorder, generalized anxiety disorder, somatoform disorder, compulsive personality disorder, and borderline personality type." Other witnesses testified that B.F. suffered from post-traumatic stress, attention deficit disorder, and panic disorder as well.[4]

As noted earlier, the proofs about B.F.'s medical condition were developed at trial. The Association, instead, could have asked for more information in response to B.F.'s initial request for an accommodation. HUD's Guidance is instructive on this point. Housing providers can ask individuals to provide information that confirms they have a disability and need a support animal, such as a determination from a government agency or a letter from a health care professional. HUD Guidance at 10; see also Viscik, 173 N.J. at 16 (requiring medical evidence when a disability "is not readily apparent"); DCR Guidance (same). But "medical records or a medical examination cannot be required." HUD Guidance at 14.

## B.

In addition to establishing their disability, residents have the initial burden to demonstrate the accommodation they seek is necessary. B.F. must

---

[4] Whether B.F. disclosed her medical condition on a firearms application form is not relevant to the legal issues this appeal presents. The Attorney General, appearing as amicus, can take appropriate steps to address whether B.F. should be allowed to purchase and own firearms today.

show that the accommodation to the Association's pet policy "<u>may be</u> <u>necessary</u> to afford" her an "equal opportunity to use and enjoy a dwelling." N.J.A.C. 13:13-3.4(f)(2) (emphasis added).

The necessity requirement "asks whether the requested accommodation ameliorates the disability's effects." <u>Bhogaita</u>, 765 F.3d at 1289; <u>see also</u> <u>Anderson</u>, 798 F.3d at 361 ("Equal use and enjoyment of a dwelling are achieved when an accommodation ameliorates the effects of the disability such that the disabled individual can use and enjoy his or her residence as a non-disabled person could."); <u>Oras</u>, 373 N.J. Super. at 315 (same). In essence, the question is whether the accommodation will alleviate at least one symptom of the disability, not whether the accommodation will cure or eliminate the disability.

Here as well, trial testimony provided a record for the chancery court. Rim testified that Luna helped with B.F.'s emotional state. Her depressive episodes were shorter and more "mild to moderate" than before, and Luna "helped improve [B.F.'s] ability to cope with day-to-day things" and stressors. If Luna "were to be taken away," Rim opined, "that would be very detrimental to [B.F.'s] health."

Dr. Cannon testified similarly. She observed that although B.F. "still suffered from bouts of depression and anxiety," the episodes "were much less

severe," and Luna "keeps [B.F.] stable." Cannon opined that Luna "helps [B.F.] enjoy . . . daily living in [the] condo" and that, if Luna were taken away, B.F. would decompensate -- "which could be potentially dangerous" -- and "her condition would deteriorate."

Dr. Siegert reached a different conclusion. He concluded that Luna had not "directly ameliorated" any of B.F.'s symptoms and that B.F. "did not require a dog to have equal use and enjoyment of the [condominium] unit."

After hearing all the evidence, the chancery court made these findings:

> [T]he Court does believe that [B.F.] has demonstrated that this dog has acted to relieve certain symptoms of her mental health conditions either by shortening or lessening them. The dog has also allowed [B.F.] to remain in the . . . unit without [K.P], which she couldn't do before she had the dog. She says the dog sits next to her if she has an episode in the closet, which helps her to lessen or shorten the extent of the episode.
>
> . . . .
>
> [B]ecause this particular dog offers [B.F.] comfort and seems to assist her in lessening her episodes, the Court is making an allowance for [B.F.] to keep this dog.
>
> (emphasis added).

The Appellate Division similarly observed that "B.F.'s mental health professionals testified that Luna ameliorated certain symptoms of B.F.'s disability."

31

Both the chancery court and the Appellate Division emphasized that no mental health professional had recommended or prescribed an emotional support animal for B.F. The LAD does not require that. As noted earlier, to satisfy the necessity prong, B.F. had to show that the accommodation she requested -- the support animal -- would enhance her "quality of life by ameliorating" one or more "effects of the disability," Oras, 373 N.J. Super. at 315, and thereby afford B.F. the "equal opportunity to use and enjoy [the] dwelling," N.J.A.C. 13:13-3.4(f)(2). For the same reason, B.F. was not required to establish a specific need for a dog that exceeded the Association's weight limit.

Neither B.F. nor K.P. notified the Association in advance of B.F. acquiring an emotional support animal. Although residents can request an accommodation before or after getting a support animal, see HUD Guidance at 8, residents who act on their own run the risk of losing the animal if they cannot make the required showing later. When possible, it is preferable to engage in a collaborative conversation in advance. At the same time, we recognize the issue is not a simple one because residents may not know in advance whether a particular ESA will help ameliorate their symptoms.

32

C.

In an LAD case, the burden then shifts to the housing provider to prove the requested accommodation was unreasonable. That question involves a fact-specific weighing of the relevant costs and benefits. Oras, 373 N.J. Super. at 315. As noted earlier, housing providers are not obligated "to do everything humanly possible to accommodate a disabled person." Ibid. We agree with the Division that the proper inquiry considers whether "allowing . . . an ESA would fundamentally alter the housing provider's operations or impose an undue financial or administrative burden on the housing provider." DCR Guidance.

Whether the animal has been trained is not a relevant consideration because, "unlike service or guide animals, ESAs are not individually trained to perform specific tasks associated with their owner's disability." Ibid.; see also HUD Guidance at 1 (noting that "untrained animals" can "provide therapeutic emotional support"); Warren v. Delvista Towers Condo. Ass'n, Inc., 49 F. Supp. 3d 1082, 1087 (S.D. Fla. 2014) (same).

Here, the chancery court found "that Luna ha[d] not been at all disruptive," "doesn't bark," and "is not a nuisance." The court also noted "there have been no complaints about this dog."

33

As noted earlier, before a housing provider denies a request on reasonableness grounds, the parties should engage in good-faith, interactive discussions to evaluate the accommodation and explore possible alternatives. In this case, no such discussion took place. Written exchanges at the outset highlight firm positions from the start.

V.

We add one additional point. The chancery court dismissed defendants' discrimination claims. It granted relief on equitable grounds under its review of the Association's breach of contract claim. But in a dispute like this, a contract claim is ancillary to a discrimination claim. See Pressler & Verniero, Current N.J. Court Rules cmt. 2.2.1 on R. 4:35-1 (2024) ("[T]he determination of whether . . . claims are ancillary or primary depends on the overall posture of the litigation at its inception."). Two examples help explain why.

If a resident has a disability and requests a necessary and reasonable accommodation, a condominium association cannot simply deny the request and prevail by relying on its pet policy. The matter would need to be addressed under the framework outlined above for discrimination claims.

On the other hand, if a resident falsely asserts that they are disabled, or has no viable discrimination claim for some other reason, an association might

34

be able to prevail on a breach of contract claim.  Either way, however, the contract claim is secondary to the discrimination claim.

In this case, because B.F. has a disability, and Luna, as a support animal, is not subject to a pet policy, the dispute could not be resolved under a breach of contract theory.  To the extent any judgment is based on the Association's breach of contract claim, it is therefore reversed.[5]

The proper starting point is defendants' discrimination claim.  In light of the record in this case, the chancery court and Appellate Division should not have dismissed B.F. and K.P.'s claim under the LAD and FHA.  B.F. presented evidence of her need for an accommodation, which the Association disputes.  Whether the Association has shown the accommodation sought is unreasonable is also disputed.  Both of those inquiries are fact-sensitive.  See Oras, 373 N.J. Super. at 315-16.

An additional fact raises a challenging question about the interplay between the Chancery and Law Division in this appeal.  In their second amended counterclaim, B.F. and K.P. requested a jury trial for their respective

---

[5]  In light of our ruling, we do not address the Association's arguments relating to the business judgment rule.  See Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 369 (2007) ("Pursuant to the business judgment rule, a homeowners' association's rules and regulations will be invalidated (1) if they are not authorized by statute or by the bylaws or master deed, or (2) if the association's actions are fraudulent, self-dealing or unconscionable."  (quotation omitted)).

35

claims under the LAD and FHA, and they sought a judgment, damages, costs, and injunctive relief. The bench trial conducted before the chancery court addressed the Association's effort to enforce its pet policy -- not the LAD or FHA claims that awaited a jury trial. As a result, neither the chancery court's findings nor our observations in reviewing what has occurred to date can substitute for a jury determination on the discrimination counterclaim, which the parties are entitled to.

We therefore remand the matter to the Law Division for further proceedings consistent with this opinion. At oral argument, the Association conceded that it was not contesting disability. In a letter submitted after argument, the Association stated that "B.F.'s LAD disability is the law of the case." That concession settles the threshold question in the discrimination claim -- whether B.F. suffers from a disability. All of the other issues relating to the disability claim need to be resolved on remand.

There are ways the parties may streamline any future proceedings. For example, they can withdraw the jury trial demand. See R. 4:35-1(d) (requiring the consent of all parties). They can also stipulate to evidence already presented at the bench trial before the chancery court.

We recognize this dispute began in 2018 and that a good deal of time, money, and energy has been expended since then. Nothing prevents the parties

36

from engaging in a good-faith, interactive process at this time to try to resolve the ongoing dispute.

Because of the posture of the case, however, we cannot decide whether Luna can remain in the condominium complex. The outcome will be determined in the Law Division. Until then, the Association may not order defendants to remove Luna from the property.

## VI.

For the reasons set forth above, we reverse the judgment of the Appellate Division, vacate the dismissal of defendants' counterclaim under the LAD and FHA, and remand to the Law Division for further proceedings consistent with this opinion.


JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in CHIEF JUSTICE RABNER's opinion. JUSTICE WAINER APTER did not participate.

37